**Bertha O. HOWELL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 3997.

United States District Court
N. D. Indiana,
South Bend Division.
Oct. 22, 1968.

John L. Carey and Bruce R. Bancroft, of Thornburg, McGill, Deahl, Harman, Carey & Murray, South Bend, Ind., for plaintiff.

Mitchell Rogovin, Asst. Atty. Gen., Alfred W. Moellering, U. S. Atty., and David A. Wilson, Jr., and D. Patrick Mullarky, Dept. of Justice, for defendants.

## OPINION

GRANT, Chief Judge.

This action, filed on May 11, 1967, for a refund of gift taxes and interest, is brought under the authority of 28 U.S.C. § 1346(a). It came to the Court on stipulated facts and exhaustive and imaginative briefs of law. The relevant facts appear below.

Taxpayer, Bertha O. Howell, made a taxable gift of 45,085 shares in Massachusetts Investors Trust,[1] an open-end investment company ("mutual fund"), in 1964. She filed a return in 1965, valuing these shares at $16.10 each, this being the net asset value of such shares.[2] A gift tax of $7,633.10 was paid in 1965. In 1966 the Commissioner of Internal Revenue assessed a deficiency of $2,092.-98 after determining that taxpayer incorrectly valued the shares in M.I.T. The Commissioner determined that the M.I.T. shares should have been valued at $18.66 each, this representing the public offering price.[3] After paying the assessed deficiency, taxpayer's claim for a refund of $2,261.79 (the deficiency plus interest) was denied on May 4, 1967. This action followed.

Although there is no restriction on the transferability of shares in M.I.T., they are not sold in the securities market. The only practical method of disposition is redemption. M.I.T. is required by 15 U.S.C. § 80a–22(a) (1) to redeem outstanding shares in itself at the current net asset value. Conversely, a share in M.I.T. is sold to a member of the public at the current public offering price described in the prospectus. 15 U.S.C. § 80a–22(d).

Economically, a person owning a share in M.I.T. has an asset which, at any given point in time, has a purchase price in excess of its redemption value. To compound the misery, the Commissioner, in the Regulation implementing I.R.C. (1954) § 2512(a),[4] states that the value of a share in M.I.T., for federal gift tax purposes, shall be its replacement value (current public offering price), not the

---

1. Hereinafter referred to as M.I.T. M.I.T. is regulated under the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq. M.I.T. is also registered with the Securities and Exchange Commission.

2. The net asset value, or bid price, was determined, roughly, by subtracting M.I.T.'s liabilities from the market value of all investments owned (net worth) and dividing that figure by the then total outstanding shares.

3. The public offering price, or asked price, is the net asset value of a share plus a loading charge. The loading charge, or load, is used only to cover issuing expenses, 15 U.S.C. § 80a–2(a) (34). It is not used to pay professional fees, etc., incurred in managing M.I.T. The load is, essentially, a broker's commission. It is based on a percentage of the net asset value of the shares purchased. The loading charge for M.I.T. shares varies between 8.5% and 1.75%, depending on the volume of shares purchased. The average load is between 7% and 8.5%.

4. "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift."

price it will command upon redemption (net asset value).[5]

■ There is no contention made in this case that this Regulation was not followed. Taxpayer, as she must, attacks the validity of the Regulation.[6] If the Regulation is consistent, and in harmony, with the statute, it is valid, Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948). If not, it must fall. See Estate of McCoy, 50 T.C. #53 (1968).[7]

■■ Generally, the value to be placed on an asset, for federal gift tax purposes, is its fair market value. Fair market value, in turn, is generally the price at which a willing buyer and a willing seller, neither under any compulsion to trade and both having reasonable knowledge of relevant facts, will strike a bargain.[8] Taxpayer, forcefully, makes four basic arguments in support of her position that Regulation § 25.-2512–6(b) does not adopt standards consonant with the accepted understanding of fair market value. They are: (1) The net asset value of M.I.T. shares[9] is determined in the stock market. The "asked for" price (net asset value plus sales load) is not set by the market, but is an artificial price set by the issuer. Further, the sales load covers the issuer's expense and adds nothing to the value of the shares. (2) The value of stocks and bonds sold on the national exchange is the mean between the highest and lowest quoted selling prices on the date of the gift. Regulation § 25.2512–2(b). This value does not include broker's commissions.[10] To distinguish between stocks and bonds, on the one hand, and "mutual funds", on the other, is arbitrary. (3) The "asked for" price valuation discriminates unfairly against a taxpayer who makes a taxable gift of a relatively small quantity of M.I.T. shares because the sales load varies according to volume.[11] (4) The Regulation attacked fails to take into account the well-accepted rule that the taxable value of a gift, subject to a liability (the liability, says taxpayer, is the sales load), may not exceed the fair market value of the gift less the fair market value of the liability. Commissioner of Internal Revenue v. Proctor, 142 F.2d 824, 154 A.L.R. 1215 (4th Cir. 1944); Jackman

---

5. Reg. § 25.2512–6(b) provides in pertinent part:

Valuation of shares in an open-end investment company: (1) The fair market value of a share in an open-end investment company (commonly known as "mutual funds") is the public offering price of a share, adjusted for any reduction in the price to the public in acquiring the number of shares included in the particular gift.

6. Taxpayer does not argue that because of facts peculiar to this case that the Regulation is invalid. Rather, her argument is directed toward the proposition that the Regulation, on its face, is invalid.

7. In Estate of Wells, 50 T.C. #88 (1968) the Tax Court of the United States, over a strong dissent, upheld the validity of Reg. § 20.2031–8(b) which provides that the value of a share in a "mutual fund", for federal *estate* tax purposes, is the public offering price of such share.

8. See Elmhurst Cemetery Co. v. Commissioner of Internal Revenue, 300 U.S. 37,

57 S.Ct. 324, 81 L.Ed. 491 (1937); Reg. § 25.2512–1; 1 Mertens, Law of Federal Income Taxation § 6.02.

9. More precisely, the fair market of the investments owned by M.I.T.

10. This is not correct. Gift tax value does include selling expenses incurred by a seller-donor. Reg. § 25.2512–2(b) provides that the value of the stock equals the gross sales price, even though the seller will receive only the net sale price, after the broker has deducted his commission and paid the seller the balance.

11. Taxpayer in her brief states that the sales charge applicable to the number of shares she gave away in 1964 was 4%. If the net asset value of these shares was $16.70 each, the gift tax value, under the Regulation in question, was increased by 67¢ a share. If another taxpayer were to have made a taxable gift of 100,000 shares in M.I.T. on the same date, the load would only have increased the gift tax value by 29¢ a share.

v. Commissioner of Internal Revenue, 44 B.T.A. 704 (1941).[12]

In our view, these arguments, strong and imaginative as they may be, do not carry the day.

The first two arguments are built upon the assumption that the value determining market is the exchange where M.I.T.'s investments are traded. This assumption requires that M.I.T. be regarded as a mere transparency, a conduit, and that for gift tax purposes, Bertha O. Howell be regarded as owning the investments held by M.I.T. rather than shares in M.I.T.

"Mutual funds" are no strangers to litigation. They have, in other contexts, raised the question of whether they are to be treated as distinct entities or conduits.[13] As can be expected, the courts have given different answers.[14] The reason is that an open-end investment company can be viewed as either a type of "agency", providing management, diversification, and professional services to the shareholders; or it can be viewed in terms of traditional commercial operation, the investments being the stock in trade of the company. There are persuasive arguments to support both points of view. The conflict presented by this case, however, does not require a determination of which view is more correct. The status of "mutual funds" is sufficiently ambiguous to admit of resolution in either direction.[15] Under such circumstances, we cannot say that the theory implicitly adopted by Regulation § 25.2512–6(b) is inconsistent with the controlling statute. As stated by the court in Mearkle's Estate v. Commissioner of Internal Revenue, 129 F.2d 386, 388 (3d Cir. 1942):

> It may well be that there are several methods of valuation which could be resorted to here, and that more than one of those methods would be reasonable. One is set out in the Regulations. * * * a Regulation prescribing a method for valuation is not to be stricken down by the taxpayer's preference for a different method.

Viewing the value determining market as the market for shares in M.I.T., not the market for listed securities held by M.I.T., it seems to this Court that the different treatment accorded "mutual fund" shares from listed stocks and bonds is justified. The only transaction with regard to shares in M.I.T. which involves a willing seller and a willing buyer is the original purchase of such shares at the public offering price. Here, neither the buyer nor M.I.T. are under any compulsion to trade. The buyer is willing to pay the additional sales charge in order to obtain the shares. Unlike listed securities which

---

12. This argument appears to the Court to be a concession that Reg. § 25.2512–6(b) is valid as far as it goes, the only indictment being that it does not explicitly recognize a rule already adopted by the courts.

13. One such other context is whether a capital gains distribution should be allocated to the trust income or principal account. See Case Comment, 42 Notre Dame Lawyer 251 (1966).

14. Case Comment, 42 Notre Dame Lawyer 251 (1966).

15. The Tax Court, in Estate of Wells, supra, rejected the argument that the technical niceties of ownership as regards "mutual funds" shareholders should be disregarded for federal estate tax purposes. In other words, the "mutual fund" was not to be treated as a conduit. It owned the investments; the shareholder owned the shares in the company.

This Court notes that Congress has seen fit to relieve shareholder-taxpayers of the double thunder occasioned by the two-layer income tax. A mutual fund which distributes the required amount of its net investment income to its shareholders is not taxed on such income. I.R.C. (1954) §§ 851–855. See generally, Kern, Federal Income Taxation of Regulated Investment Companies, 42 Notre Dame Lawyer 29 (1966). The fact that Congress has not afforded comparable relief for gift tax payers, by allowing "mutual funds" to be treated as conduits for federal gift tax purposes, lends some support to the Defendant's position here.

can be disposed of on an established market, shares in M.I.T., as a practical matter, can only be liquidated by the exercise of redemption rights which may not be suspended by the company. See Estate of Wells, supra. The obstacle to using the value upon which the redemption transaction rests is that redemption does not involve a willing "buyer". M.I.T., at the shareholder's election, must redeem the shares in itself. See Estate of Wells, supra.

There is indirect case support for the validity of Regulation § 25.2512–6(b). In Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813 (1941) the United States Supreme Court held that the replacement cost, not liquidation value was the proper value to ascribe to a single premium life insurance policy for federal gift tax purposes. The *explicit* rationale of *Rasquin* was that an insurance policy has more than liquidation rights; there are death benefits and investment rights. All elements of value must be considered.

Taxpayer replies that an insurance contract is different from a share in M.I.T. The loading charge is merely an expense; it does not account for an item of value in the share. In the insurance policy situation the higher reproduction cost is attributable to an economic benefit, *viz.*, the death benefit protection.

This argument overlooks the fact that the insurance salesman's commissions are definitely an item in computing the reproduction cost of an insurance policy. Like the loading charge in the case of M.I.T. shares, it represents an expense of marketing. Because the Court in *Rasquin* did not indicate that a reduction was to be made for sale's commissions in determining reproduction cost of an insurance policy, we regard the implicit holding there to be sufficiently broad to accommodate the decision reached here—that is, that a Regulation which requires the marketing expense to be included in the gift tax value of a share in M.I.T. is reasonable.

Taxpayer's third argument, that Regulation § 25.2512–6(b) is invalid as discriminatory because the public offering price includes a sales load which varies with the amount of shares purchased, does not, in the last analysis, convince us. Quantity discounts are an economic fact of life. Most certainly, quantity alone has economic consequences. One with large purchasing power can gain advantages not available to those without such power. This may be discriminatory in the economic sense, depending upon one's political and economic views. That, however, does not make for legal discrimination. The inquiry, as we see it, is not solely into the economics of the transaction, but whether the tax fairly reflects the economic event upon which it rests. This is what is meant by fair market value. If quantity may be considered in lowering what would otherwise be the fair market value, Commissioner of Internal Revenue v. Shattuck, 97 F.2d 790, 792 (7th Cir. 1938) (blockage), then surely quantity may be considered in raising what would otherwise be fair market value. Quantity is a two-edged sword.

■ This Court has no quarrel with the rule that the gift tax value of an asset is its fair market value less the value of outstanding liabilities which attach to it. Commissioner of Internal Revenue v. Proctor, supra; Jackman v. Commissioner of Internal Revenue, supra. It is simply inapplicable here. A liability is essentially futuristic. It connotes an occurrence which may or will happen. It is a debt due, not an expense paid. The loading charge was not a liability as to the shares of M.I.T., the subject of the gift which generated this dispute. It was an expense paid. On the record here present it is quite clear that taxpayer, on the date of the gift, owned 100% of the equity in the shares.

The Plaintiff has not convinced the Court that the Regulation which she has attacked is unreasonable or out of harmony with the statute. Therefore, judgment must be for the Defendant, the United States of America.