Robert C. DAVIS, as surviving joint tenant and statutory Executor of the Estate of Isabelle Mildred Davis, deceased, Plaintiff,

v.

UNITED STATES, Defendant.

Civ. No. 69–417–AAH.

United States District Court
C. D. California.

Nov. 20, 1969.

determined twice daily and based upon the total market value of the portfolio securities owned by the Fund. The actual offering price to the general public is the net asset value per share, plus a sales commission which is a varying percentage of the offering price, dependant upon the quantity of shares purchased in a single transaction, and ranging from 2½% on sales of $100,000 or more to 7½% on sales of $5,000 or less.

Clarke & Swink by Dickinson Thatcher, North Hollywood, Cal., for plaintiff.

Wm. Matthew Byrne, Jr., U. S. Atty., Charles H. Magnuson, Mason C. Lewis, Asst. U. S. Attys., Los Angeles, Cal., for defendant.

·HAUK, District Judge.

Non-jury trial has been concluded in this civil action against the United States for the recovery of estate taxes alleged to have been erroneously and illegally collected, jurisdiction existing by virtue of 28 U.S.C. § 1346 (1962).[1] The Court, having heard full arguments and having considered the points and authorities submitted by counsel for both parties, now renders its decision.

At the time of the death of Decedent, Isabelle Mildred Davis on March 29, 1965, she and her husband held joint tenancy ownership in a modest accumulation of property. On June 23, 1966, the husband, as surviving joint tenant and statutory executor of his wife's estate, filed an Estate Tax Return Form 706 which, as part of the assets of the estate held in joint tenancy, listed 9,518 shares of Affiliated Fund, Inc., an open-end investment company.

The capital stock of Affiliated Fund, Inc. is offered by the investment company to the public at a price per share

The charter of Affiliated Fund, Inc. guarantees stockholders the right to have their shares of stock redeemed or repurchased by the company at the net asset value per share of the portfolio securities owned by the Fund, based upon closing market prices on the day the stock certificates are surrendered to the company. Plaintiff and defendant here have stipulated that in the normal course of business no portion of the 9,518 shares of Affiliated Fund, Inc. in Decedent's estate would or could have been sold except by way of sale to the company at this redemption or repurchase price guaranteed by its charter.

On the Estate Tax Return the 9,518 shares of Affiliated Fund, Inc. were valued at the redemption price of $9.06, or a total of $86,233.08. On April 25, 1968, the Government sent its 90-day letter to the Estate, assessing a tax deficiency computed by adjusting upwards the valuation of the 9,518 shares upon the theory that the shares should have been valued at the "*offering* price to the public", rather than at the "*redemption* price", and upon the determination that the last "public offering price" on the date of Decedent's death, March 29, 1965, for this number of shares was $9.43 per share or a total of $89,754.74 as compared with the redemption price of $9.06 per share or a total of $86,233.08.

---

1. 28 United States Code § 1346 (1962):

"**§ 1346. United States as defendant**
  (a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:
  (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws;  * * *."

The deficiency assessed by the Internal Revenue Service was paid, and on October 11, 1968, plaintiff filed a claim for a refund which was denied. Thereupon, having complied with the prerequisites of 26 U.S.C. 7422 (1967),[2] plaintiff, as

2. 26 United States Code § 7422 (1967):

"§ 7422. Civil actions for refund

(a) No suit prior to filing claim for refund.—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.

(b) Protest or duress.—Such suit or proceeding may be maintained whether or not such tax, penalty, or sum has been paid under protest or duress.

(c) Suits against collection officer a bar.—A suit against any officer or employee of the United States (or former officer or employee) or his personal representative for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected shall be treated as if the United States had been a party to such suit in applying the doctrine of res judicata in all suits instituted after June 15, 1942, in respect of any internal revenue tax, and in all proceedings in the Tax Court and on review of decisions of the Tax Court where the petition to the Tax Court was filed after such date.

(d) Credit treated as payment.—The credit of an overpayment of any tax in satisfaction of any tax liability shall, for the purpose of any suit for refund of such tax liability so satisfied, be deemed to be a payment in respect of such tax liability at the time such credit is allowed.

(e) Stay of proceedings.—If the Secretary or his delegate prior to the hearing of a suit brought by a taxpayer in a district court or the Court of Claims for the recovery of any income tax, estate tax, or gift tax (or any penalty relating to such taxes) mails to the taxpayer a notice that a deficiency has been determined in respect of the tax which is the subject matter of taxpayer's suit, the proceedings in taxpayer's suit shall be stayed during the period of time in which the taxpayer may file a petition with the Tax Court for a redetermination of the asserted deficiency, and for 60 days thereafter. If the taxpayer files a petition with the Tax Court, the district court or the Court of Claims, as the case may be, shall lose jurisdiction of taxpayer's suit to whatever extent jurisdiction is acquired by the Tax Court of the subject matter of taxpayer's suit for refund. If the taxpayer does not file a petition with the Tax Court for a redetermination of the asserted deficiency, the United States may counterclaim in the taxpayer's suit, or intervene in the event of a suit as described in subsection (c) (relating to suits against officers or employees of the United States), within the period of the stay of proceedings notwithstanding that the time for such pleading may have otherwise expired. The taxpayer shall have the burden of proof with respect to the issues raised by such counterclaim or intervention of the United States except as to the issue of whether the taxpayer has been guilty of fraud with intent to evade tax. This subsection shall not apply to a suit by a taxpayer which, prior to the date of enactment of this title, is commenced, instituted, or pending in a district court or the Court of Claims for the recovery of any income tax, estate tax, or gift tax (or any penalty relating to such taxes).

(f) Limitation on right of action for refund.—

(1) General rule.—A suit or proceeding referred to in subsection (a) may be maintained only against the United States and not against any officer or employee of the United States (or former officer or employee) or his personal representative. Such suit or proceeding may be maintained against the United States notwithstanding the provisions of section 2502 of title 28 of the United States Code (relating to aliens' privilege to sue).

(2) Misjoinder and change of venue.—If a suit or proceeding brought in a United States district court against an officer or employee of the United States (or former officer or employee) or his personal representative is improperly brought solely by virtue of paragraph (1), the court shall order, upon such terms as are just, that the pleadings be amended to substitute the

surviving joint tenant and statutory executor of the Estate, filed this civil action for refund of taxes and interest erroneously and illegally collected.

The sole issue to be decided is the validity of Treas.Reg. § 20.2031–8 (b) (1963),[3] pursuant to which the Internal Revenue Service values the shares of open-end investment companies at their offering price to the public rather than at their redemption price. We conclude that the Treasury Regulation is invalid, that the 9,518 shares of Affiliated Fund, Inc. should have been valued for estate tax purposes at their redemption price and not at their offering price to the public, and that pursuant to stipulation of the parties, plaintiff is entitled to recover from defendant the principal sum

of $523.53 together with interest on $190.41 from June 23, 1966, interest on $232.44 from May 16, 1967, and interest on $100.68 from September 24, 1968, all at the rate of 6% per annum, together with plaintiff's costs of suit incurred herein.

The gross estate for estate tax purposes is defined by Congress in Int.Rev. Code of 1954, § 2031(a), 26 U.S.C. § 2031 (a) (1967): "The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." Provisions similar to § 2031(a) defining the gross estate have appeared in the Revenue Acts since 1916.[4]

United States as a party for such officer or employee as of the time such action commenced, upon proper service of process on the United States. Such suit or proceeding shall upon request by the United States be transferred to the district or division where it should have been brought if such action initially had been brought against the United States."

3. Treas.Reg. 20.2031–8(b).

"(b) *Valuation of shares in an open-end investment company.* (1) The fair market value of a share in an open-end investment company (commonly known as a "mutual fund") is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. If the alternate valuation under section 2032 is elected, the last public offering price quoted by the company for the alternate valuation date shall be the applicable public offering price. If there is no public offering price quoted by the company for the applicable valuation date (e. g., the valuation date is a Saturday, Sunday, or holiday), the fair market value of the mutual fund share is the last public offering price quoted by the company for the first day preceding the applicable valuation date for which there

is a quotation, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In any case where a dividend is declared on a share in an open-end investment company before the decedent's death but payable to shareholders of record on a date after his death and the share is selling "ex-dividend" on the date of the decedent's death, the amount of the dividend is added to the ex-dividend quotation in determining the fair market value of the share as of the date of the decedent's death. As used in this paragraph, the term "open-end investment company" includes only a company which on the applicable valuation date was engaged in offering its shares to the public in the capacity of an open-end investment company.

(2) The provisions of this paragraph shall apply with respect to estates of decedents dying after October 10, 1963. [Reg. § 20.2031–8.]"

4. Similar provisions to this section were contained in Section 811 (opening par.) (k) of the 1939 Internal Revenue Code.
Provisions similar to those in section 811, I.R.C.1939, were contained in the following prior Revenue Acts:
1924—June 2, 1924, c. 234, § 302, 43 Stat. 304
1921—Nov. 23, 1921, c. 136, § 402, 42 Stat. 278
1919—Feb. 24, 1919, c. 18, § 402, 40 Stat. 1097
1916—Sept. 8, 1916, c. 463, § 202, 39 Stat. 777

Pursuant to Int.Rev.Code of 1954, § 7805(a),[5] 26 U.S.C. § 7805(a) (1967), it is clear that the Secretary of the Treasury and his delegate have authority to prescribe all needed rules and regulations for the enforcement of the Internal Revenue Code. Furthermore, it is clear "that Treasury Regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons." Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). Regulation 20.2031–8(b) (1963), which is directly involved in this case and under which the Internal Revenue Service valued the 9,518 shares of the Fund at their offering price to the public, did not become effective until 1963 and then only after October 10, 1963. Prior to this Regulation there was no clear rule of valuation or specific definition of value for estate tax purposes of the shares of an open-end investment company.[6] But since the statutory definition of value had been in the Revenue Acts since 1916, it is obvious that this Regulation cannot in any sense be deemed a contemporaneous construction of the statute, and since it did not apply until October 10, 1963, it is by no means a long standing Regulation entitled to the judicial respect that longevity sometimes merits. No wonder it has generated the adverse reaction and criticism of the American Bar Association's Taxation Section,[7] a Congressional Bill to amend the Internal Revenue Code to require redemption price valuation,[8] and a rash of lawsuits throughout the country.[9]

That other Federal Courts should not have any greater difficulty than we do in overturning Regulation 20.2031–8(b) is indicated by recent tax cases which have invalidated the arbitrary and dis-

---

5. 26 United States Code § 7805(a):
"(a) *Authorization.*—Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary or his delegate shall prescribe all needful rules and regulations for the enforcement of this title, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."

6. Due to the unsettled status of the valuation issue, and prior to October 11, 1963, the valuation of mutual fund shares reported on the basis of redemption value, or the mean between redemption value and public offering price, was not disturbed by the IRS if, when requested by a district director, a collateral agreement was furnished by all interested parties. The agreement had to indicate that the reported value would be treated by the executor and all distributees as the tax basis of any shares so valued. Rev.Pro. 64–18, 64–1. Cum.Bull. 681.

7. Bulletin of the Section of Taxation, American Bar Association, Volume XIX, No. 4, at 73 (1966).

8. H.R. 844, 91st Cong., 1st Sess. (1969). Representative Craig Hosmer introduced a bill on January 3, 1969 to amend § 2031(b) of the Internal Revenue Code of 1954.
"(2) SPECIAL RULE FOR SHARES IN AN OPEN-END INVESTMENT COMPANY.—
In the case of shares in an open-end investment company (commonly known as a 'mutual fund'), and in securities trust agreements, the value thereof shall be the price at which such company would redeem such shares on the date of the decedent's death (or, if applicable, on the alternate valuation date determined under section 2032)."

9. For example, see the following cases that were pending on July 1, 1969 and that involved the valuation of mutual fund shares for purposes of the Federal estate or gift tax.
Covic v. U. S. A., Tax Court, Detroit, Michigan, No. 4667–68 (1968); Hurst v. U. S. A., Tax Court, Louisville, Kentucky, No. 4291–68 (1968); York v. U. S. A., Tax Court, St. Paul, Minnesota, No. 3698–67 (1967); and Clanton v. U. S. A., Tax Court, New Orleans, Louisiana, No. 4299–68 (1968).

criminatory regulations imposed upon personal service corporations.[10]

Every attempt by the Internal Revenue Service to enforce the new regulations dealing with personal service corporations has been vigorously rebuffed by the courts. In the words of the most recent case, Kurzner v. United States, 413 F.2d 97, 106 (5th Cir., 1969):

> "Since the adoption of the 1965 amendments, the IRS has attempted in a number of cases to enforce the new rules. The judicial response has been unanimous: the courts have invalidated the amended regulations as being arbitrary and discriminatory legislation by an administrative agency which is only authorized to interpret congressional acts."

See also, O'Neill v. United States, 410 F.2d 888 (6th Cir., 1969); and United States v. Empey, 406 F.2d 157 (10th Cir., 1969).

The basic rule for determining the "value" of property includible in the decedent's gross estate for estate tax purposes under Int.Rev.Code of 1954, §§ 2031 to 2044, is contained in Treasury Regulation 20.2031–1(b), T.D. 6826, 1 Fed.Est. & Gift Tax Rep. ¶ 1200 at 961, which provides that "value" generally means the fair market value at the date of decedent's death or upon the date prescribed by the alternate valuation method under Int.Rev.Code of 1954,

§ 2032. The Regulation describes the fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."

The general valuation rules must be read in conjunction with the rules governing specific items of property. Reg. 20.2031–3 (1958) applies to the valuation of an interest in a business and specifically describes relevant factors to be used in determining the fair market value. Reg. 20.2031–2 (1958) applies the fair market value rule to stocks and bonds. If there is a market for the stocks and bonds the "mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond", but where no selling prices or bid and asked prices are available, the Regulation specifies relevant factors to consider, such as the "soundness of the security", the "economic outlook in the particular industry", and "the company's position in the industry". Reg. 20.2031–8(a), T.D. 6680, 1 Fed.Est. & Gift Tax Rep. ¶ 1211 at 1402, covers the valuation of certain life insurance and annuity contracts and specifies the value to be the price at which "a company regularly engaged in the selling of contracts of that character" sells a "comparable contract". All of

---

10. After the Ninth Circuit had held that a group of doctors could, by incorporating and setting up profit-sharing and pension plans, take advantage of the benefits of the corporate tax laws, United States v. Kintner, 216 F.2d 418 (9th Cir., 1954), the Internal Revenue Service struck back in 1960 with the so-called "Kintner Regulations", Treas. Reg. §§ 301.7701–1 to 11 (1960), 1960–2 Cum.Bull. 409, which reduced the test of "corporateness" to four equally weighted procrustean criteria: (1) continuity of life; (2) centralization of management; (3) limited liability; and (4) free transferability of interests. But, in so doing, the Internal Revenue Service also provided that local law should govern in determining whether these standards had been met. The professionals thereupon went to their re-

spective State legislatures and obtained authority to incorporate. Whereupon the Internal Revenue Service retaliated again by amending the "Kintner Regulations" in 1965 to exclude professional service corporations from the benefits of the corporate tax laws by refusing to classify them as corporations for the purpose of corporate taxation. Treas.Reg. 301.7701.2 (1965). The courts have refused to enforce these amended Regulations, and after a long and unbroken series of defeats in the courts, the Internal Revenue Service finally reversed its policy and conceded that professionals can practice in the corporate form and obtain the tax benefits of the corporate tax laws. T.I.R. No. 1019, August 8, 1969, 7 CCH 1969 Stand.Fed.Tax Rep. ¶ 6867 at 71,625.

these regulations obviously attempt to apply the general valuation rule of fair market value to these particular types of property and thus attempt realistically to reflect the true actual value of the property to the estate of the decedent.

But Regulation 20.2031–8(b) (1963), specifically covering the valuation of shares in an open-end investment company, provides that "The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued." Thereby shares in an open-end investment company are valued in the same manner as those certain life insurance and annuity contracts which are covered by Reg. 20.2031–8(a), T.D. 6680, 1 Fed.Est. & Gift Tax Rep. ¶1211 at 1402. Yet unlike those life insurance and annuity contracts, shares in an open-end investment company do not have any value over and above the redemption price offered by the company. To value the shares of an open-end investment company at the public offering price rather than the redemption price is, in essence, an estate tax penalty for investing in open-end investment shares rather than some other type of property.

The basic fair market valuation rule cannot be applied to open-end investment shares by simplistically viewing the estate of the decedent as a "willing seller" and the open-end investment company as a "willing buyer". The difficulty in rigidly applying the "willing buyer and seller" slogan to value open-end investment company shares is that there are two separate markets that must be distinguished. The first market, and the one the Secretary of the Treasury has decided to focus on, merely because it gives the greatest amount of tax revenue to the Federal Government, is the public sales market where the offering price of the shares consists of the net asset value of the portfolio securities held by the open-end investment company plus a sales commission. The other market consists of the buying market where the shareholders who want to dispose of their shares must sell them to the open-end investment company that has guaranteed it will purchase the shares at a redemption price equal to the net asset value of the portfolio securities held by the company. The difference in the price in the two markets is the sales commission, and since the only price the estate can get is what the investment company has guaranteed it will pay, the redemption price reflects the true and actual value of the open-end investment company shares to the estate. To include the fictitious sales commission in the value of the shares to the estate is to create an artificial value that cannot possibly be obtained by the estate in any readily accessible, realistic market.

This dual market situation in open-end investment company shares is analogous to a stock or bond that is subject to a binding contract to purchase. The Secretary of the Treasury has covered the estate tax valuation of securities subject to a binding contract to purchase in Treas.Reg. 20.2031–2(h) (1958), which specifies that if a person in a bona fide business arrangement "is not free to dispose of the underlying securities at other than the * * * contract price", that price can be used to determine the value of the securities for estate tax purposes. Although there is no binding contract in this case, the rationale of Treas.Reg. 20.2031–2(h) (1958) should apply to open-end investment shares because the redemption price offered by the company truly represents the only realistic value that the estate can obtain for the shares of the open-end investment company.

It is true that in Estate of Wells v Commissioner, 50 T.C. 871 (1968), we find the court there concerned with precisely the same question as the present case, and holding that the shares in an open-end investment company are properly valued for estate tax purposes at the public offering price in accordance with the applicable regulation. But we are not convinced by the reasoning of *Wells* at 876 that "investment company

shares are a different breed of cats from ordinary stocks and bonds; and when it comes to valuing them a different criterion can reasonably be applied, more nearly like that applied to life insurance and annuity contracts than stocks and bonds". We agree that life insurance is clearly a "different breed of cats from ordinary stocks and bonds", and the Supreme Court recognized this difference in Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813 (1941), holding that the cost of a life insurance policy rather than the cash-surrender value is the proper criterion for valuation for gift tax purposes because "The owner of a fully paid life insurance policy has more than the mere right to surrender it; he has the right to retain it for its investment virtues and to receive the face amount of the policy upon the insured's death." 312 U.S. at 257, 61 S.Ct. at 509. The same criterion and rationale for valuation would appear properly to be extended to life insurance for estate tax purposes. Merrill v. Fahs, 324 U.S. 308, 65 S.Ct. 655, 89 L.Ed. 963 (1945).

But the majority in *Wells* appears to be clearly wrong in seeking to compare shares in an open-end investment company with policies of life insurance. Shares in an open-end investment company do *not* have additional rights that enhance their value above the redemption price and in a strong dissent, in which five judges concurred, Judge Tannenwald felt that Reg. 20.2031–8(b) (1963) is invalid because it leads to an unreasonable, unrealistic and fictitious valuation. "It is the total amount obtainable by the seller from the only available purchaser, not the price which a theoretical purchaser would pay another seller, which should control." 50 T.C. at 880. Nor do the same logical infirmities and unrealistic conclusions present in Howell v. United States, 414 F.2d 45 (7th Cir., 1969), another decision lending plausibility to the contentions of the Defendant, serve to convince us that the offering price is the proper method of valuation for shares of an open-end investment company.

Rather we come away from careful analysis of both *Wells* and *Howell* strengthened in our conviction that the only true, actual, realistic value to the estate of the open-end investment company shares held by the Davis Estate here is the redemption price guaranteed by the investment company, Affiliated Fund, Inc. Plaintiff is, therefore, entitled to judgment.

In accordance with the foregoing decision which shall also constitute findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure, the Court now orders that the formal findings of fact, conclusions of law and judgment signed by the Court simultaneously herewith be filed and entered herein this date.