Bernice Espy **HICKS**, as Special Fiduciary of the Estate of Pearle M. Espy, Deceased, Plaintiff,

v.

**UNITED STATES** of America, Defendant,

and

Financial Industrial Fund, Inc., et al., Intervenors.

Civ. A. No. C–2396.

United States District Court,
D. Colorado.

Dec. 20, 1971.

and plaintiff here seeks to recover estate taxes paid on the estate of Pearle M. Espy, who died October 2, 1966.

There are two basic questions to be determined. The first is the value of shares of stock owned by decedent in two closely held corporations, Espy Ice Company and City Ice Company. The second is the valuation of 574 shares of The Colonial Fund, Inc., a mutual fund. Most of the dollars involved have to do with the value of the Espy Ice and City Ice stock, but the difficult legal question is how to determine the value of the mutual fund shares, and the validity of a Treasury regulation saying how such shares must be valued.

Plaintiff filed a federal estate tax return on January 2, 1968, showing a tax due of $137,503.23, and this tax was paid. A deficiency was assessed in the amount of $52,579.74, plus interest in the amount of $6,615.68. The total deficiency of $59,195.42 was paid on April 7, 1970. A timely claim for refund was filed and denied. This suit followed.

We first consider the value of the Espy Ice Company and City Ice Company stock. On the date of her death, decedent owned outright 7,600 shares of Espy Ice, and she possessed a power of appointment over an additional 3,500 shares of that company's stock. The stock she owned outright, when combined with the stock over which she had a power of appointment, constituted approximately 52% of the outstanding stock of Espy Ice Company. Decedent was possessed of a power of appointment over 138 shares of City Ice stock, and Espy Ice owned 1,148 shares of City Ice. The shares of City Ice owned by Espy Ice and the shares of City Ice over which decedent possessed a power of appointment constituted approximately 49% of the outstanding stock of City Ice Company.

Each party called a valuation witness, and the value of the Espy Ice Company and City Ice Company stock must be determined by the Court based on the testimony of those witnesses. It may serve

Harold B. Wagner and Dean R. Vanatta, Wagner & Wyers, Denver, Colo., for plaintiff.

James P. Parker, Atty., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

Leland E. Modesitt, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for intervenors.

## MEMORANDUM OPINION

WINNER, District Judge.

This memorandum opinion contains the findings of fact and conclusions of law required by Rule 52. In this case, jurisdiction is based on 28 U.S.C. § 1346,

to put the case in focus if the values shown by the tax return, the values determined by the Commissioner, and the values testified to by the witnesses are put in tabular form. Those values, tabulated, are:

| | Espy Ice Stock | City Ice Stock |
|---|---|---|
| Estate tax return | $ 25.00 | $ 210.00 |
| Commissioner's valuation | 37.44 | 450.00 |
| Plaintiff's witness (Uhl) | 13.70 | 126.09 |
| Defendant's witness (Green) | 41.75 | 306.00 |

■ Much of the underlying value of the stock in the two companies is in the value of certain company owned real estate. The government called a second witness, a qualified appraiser, Chase, who testified to the fair cash market value of the real estate owned by the two companies, but plaintiff offered no such valuation or appraisal testimony as to the real estate. Plaintiff's only witness valued the corporate stock using the book value of the real estate, and, as we shall see presently, this was a completely unrealistic approach to value. The real estate had been owned by the companies for many, many years, and no consideration was given by plaintiff's witness to any appreciation in value of industrial Denver real property and the sky rocketing values of prime mountain property having potential for subdivision. Also, the testimony showed that a part of one piece of the mountain property had been condemned by the Colorado Department of Highways, and $13,000 has been paid as the condemnation value of this part. Yet, plaintiff's witness valued the substantial remainder of that same property at $1.00. Plaintiff's witness testified to a value of all of the real estate applied to its present use and he used only depreciated book values of the real estate in valuing the corporate stock. He at no time gave any thought to the true value of the real property owned by Espy Ice and City Ice. Using the value theories applied by plaintiff's witness, real property having an October 2, 1966, fair cash market value of $1,000,000 would be valued by him at its original cost, even though that cost might be only $25,000, and it would be valued on the basis of its applied use, even though that use was a far cry from its highest and best use. Plaintiff's valuation witness never did take into account the fair cash market value of substantial assets owned by the two corporations. It was very doubtful that his conclusions were admissible in evidence, but because he was plaintiff's only witness, the Court permitted him to testify to his conclusions. However, the Court cannot and does not accept those value conclusions.

Defendant's witness approached the problem differently. He did consider the true value of the real property as testified to by the witness Chase. He then considered sales of listed stocks of ice and cold storage companies, and made suitable and reasonable adjustments to arrive at the value of the stocks of comparable closely held corporations. He did not use a capitalization of income approach, but the Court on its own capitalized the income of the companies and adjusted for the value of the real estate as testified to by Chase. The approach used by the Court as a check against the government's expert produced remarkably similar (although somewhat higher) results to those testified to by the defendant's expert.

■ Based upon all of the evidence in the case, the Court accepts the testimony of defendant's witness and finds that on October 2, 1966, the value of the stock of Espy Ice Company was $41.75 per share and that the value of City Ice Company on that date was $306.00 per share. In making this finding, the Court is not unaware of the fact that plaintiff undertook the burden of proving that the Commissioner's valuation was wrong and that some other value was correct. Plaintiff did not actually meet her burden, and it may be that technically the Court should permit the $450 per share value determined by the Commissioner for the City Ice Company stock to stand, but this the Court cannot do as a matter of fairness. Accordingly, the Court finds the values of the stock

of Espy Ice Company and City Ice Company to be those testified to at time of trial by defendant's witnesses rather than those determined by the Commissioner.

Having decided the issues in the case applicable to almost all of the dollars involved, we pass to the truly knotty problem which arises in connection with a $363.05 difference between the tax return value and the Commissioner's determined value of the 574 shares of Colonial Fund. The tax on this $363.05 difference in value is of not much monetary importance to either party, but the valuation principle to be applied is of great importance to defendant and to all owners of investment trust shares. It is because of the importance of the question that the Court permitted intervention by the mutual funds named in the caption of the case, because it is unlikely that plaintiff can afford the luxury of appearing in the Court of Appeals for the small amount involved.

The tax return valued the Colonial Fund shares at $12,00075 per share. The Commissioner determined the value to be $12.64 per share. Thus, the return showed the shares to be worth $6,892.31, and the Commissioner says that they are worth $7,255.36, which provides us with the $363.05 difference in valuation which is in dispute. The $6,892.31 is the amount for which decedent could have redeemed the 574 shares on the date of death. The $7,255.36 is the amount it would have cost to buy those shares on that date. Undeniably, the Commissioner's valuation is correct if Regulation 20.2031–8 is reasonable and can be upheld. That regulation says:

"§ 20.2031–8 *Valuation of certain life insurance and annuity contracts; valuation of shares in an open-end investment company.*

.    .    .    .    .    .

"(b) *Valuation of shares in an open-end investment company.* (1) The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. If the alternate valuation under § 2032 is elected, the last public offering price quoted by the company for the alternate valuation date shall be the applicable public offering price. If there is no public offering price quoted by the company for the applicable valuation date (e.g., the valuation date is a Saturday, Sunday, or Holiday) the fair market value of the mutual fund share is the last public offering price quoted by the company for the first day preceding the applicable valuation date for which there is a quotation, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. .  .  .

"(2) The provisions of this paragraph shall apply with respect to estate of decedents dying after October 10, 1963."

This regulation, which is of 1963 origin, must be read against the basic concept that estate tax valuations are based on fair market value as is emphasized by the older § 20.2031–1 of the regulations, and the government's problem, simply stated, is to justify a regulation which taxes mutual fund shares at a value higher than any owner can realistically expect to receive for them. The government must justify this special treatment of shares of an investment trust fund in the full light of the general valuation principles expressed in § 20.2031–1 of the regulations, which are:

"The value of every item of property includible in a decedent's gross estate .  .  . is the fair market value thereof. .  .  . The fair market value is the price at which the property would change hands between

a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. . . . All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. . . ."

We are not the first court to face the problem, but, because the regulation in question was not adopted until 1963, there is not a plethora of authority passing on the question, and the matter has not been considered by the Supreme Court.

The first court to which the problem was presented was the Tax Court of the United States. In Estate of Wells, (1968) 50 T.C. 871, the regulation was upheld by football score majority of 7 to 6. The majority opinion analogized the valuation of investment trust shares to life insurance contracts and to a comparison with the surrender value and purchase price of such contracts. The majority in Estate of Wells also upheld the regulation by comparing the valuation of investment trust shares to the use of replacement cost in valuing property for gift tax purposes. It was said:

"It has often been held that Treasury regulations are to be sustained unless they are found to be unreasonable and plainly inconsistent with the revenue statutes. Commissioner of Internal Revenue v. South Texas Lumber Co. (1948) 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831.

"In formulating the regulations relating to valuation, open-end investment company shares were included by the Treasury in § 20.2031–8 along with 'certain life insurance and annuity contracts,' rather than in § 20.2031–2, 'valuation of stocks and bonds,' which set the value of the latter at the 'mean between the highest and lowest quoted selling prices.' Petitioner argues that this is a significant inconsistency which makes the regulation with which we are concerned of doubtful validity.

"We think this organization of the regulations was no more than recognition that investment company shares are a different breed of cats from ordinary stocks and bonds; and when it comes to valuing them, a different criterion can reasonably be applied, more nearly like that applied to life insurance and annuity contracts than stocks and bonds."

The 6-judge minority of the Tax Court was unable to buy this reasoning, and Judge Tannenwald's dissent pointed out:

"I do not dispute the principle that respondent's regulations should be sustained unless they are unreasonable. But it does not follow that, because respondent has a choice of alternatives, his choice should be sustained where the alternative chosen is unrealistic. In such a situation the regulations embodying that choice should be held to be unreasonable. In my opinion, the regulations involved herein are clearly unrealistic as applied to the factual situation involved herein and therefore to that extent unreasonable.

"The touch stone of fair market value has always been the price which a willing seller could reasonably be expected to be able to obtain from a disposition of the property in question.

Thus, if shares of stock are subject to a binding restriction, which is the product of an arm's-length transaction, that the shares may not be sold without offering them to a third person at a certain price, that price becomes the ceiling for determining the fair market value of the shares for estate tax purposes. . . .

"In the life insurance cases, the courts were obviously influenced by the facts that the insurance is a different 'breed' due to the element of insurability, or the lack thereof, of the insured at the time of the transfer and the significant increment which would be received on the death of the insured; that, shortly before the policy was transferred, the taxpayer had paid a substantially higher price for the insurance than its cash surrender value; and that there was no evidence that the policy could not have been sold, albeit in a limited market, at its replacement value or at least at a price in excess of its cash surrender value. . . .

"The emphasis by the majority on the fact that the estate and the beneficiaries may continue to own the mutual fund shares and thereby enjoy the benefit of ownership is, in my opinion, wholly misplaced. These possibilities exist with respect to every type of security. If the majority standard is correct, it would be no less 'appropriate' to use replacement cost with respect to marketable securities of all kinds. This, however, is simply not the law. That there may be an equivalence of replacement cost and fair market value in some situations does not justify the substitution of the former for the latter as the criterion in other situations where different considerations are involved.

"The plain fact is that, on the record in this case, petitioner could not dispose of the open-end investment company shares except by way of a sale to the open-end investment companies at the redemption price. That price was all that petitioner could obtain. It is

the total amount obtainable by the seller from the only available actual purchaser, not the price which a theoretical purchaser would pay another seller, which should control."

Estate of Wells was affirmed as Ruehlmann v. Commissioner, (1969) 6 Cir., 418 F.2d 1302. It was said:

"Petitioner contends that the redemption price should be the determinant of value because that price represents the amount which the decedent or the estate would have received had the shares been sold on the valuation date. However, this is not necessarily the only criterion of value for estate tax purposes. Value may be determined by an objective standard if it is not unreasonable. The hypothetical 'willing buyer' and 'willing seller' are presumed to act objectively based upon their knowledge of the relevant facts. . . .

". . . In United States v. Correll, 389 U.S. 299, 306, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967), the Court has furnished these guidelines for a court reviewing a treasury regulation:

"'Alternatives to the Commissioner's . . . rule are of course available. Improvements might be imagined. But we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code.'"

In Howell v. United States, (1968)(D.C.Ind.) 290 F.Supp. 690, the question arose in determining value of investment trust shares for gift tax purposes where a similar tax regulation was involved. Relying upon the life insurance analogy and the principles of Guggenheim v. Rasquin, (1941) 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813, which considered the valuation of life insurance policies, and relying on Estate of

Wells, supra, the regulation was held to be reasonable. The Seventh Circuit affirmed in Howell v. United States, (1969, 7 Cir.) 414 F.2d 45, and, again, principal reliance was placed on *Guggenheim* and *Estate of Wells*.

The government is presently appealing two cases in which it did not fare as well. In Davis v. United States, (1969) (D.C.Calif.) 306 F.Supp. 949, the regulation was held unreasonable and invalid. It was reasoned:

" . . . Shares in an open-end investment company are valued in the same manner as those certain life insurance and annuity contracts which are covered by Reg. 20.2031–8(a), T. D. 6680, 2 Fed.Est. & Gift Tax Rep. ¶1211 at 1402. Yet unlike those life insurance and annuity contracts, shares in an open-end investment company do not have any value over and above the redemption price offered by the company. To value the shares of an open-end investment company at the public offering price rather than the redemption price is, in essence, an estate tax penalty for investing in open-end investment shares rather than some other type of property.

"The basic fair market valuation rule cannot be applied to open-end investment shares by simplistically viewing the estate of the decedent as a 'willing seller' and the open-end investment company as a 'willing buyer'. The difficulty in rigidly applying the 'willing buyer and seller' slogan to value open-end investment company shares is that there are two separate markets that must be distinguished. The first market, and the one the Secretary of the Treasury has decided to focus on, merely because it gives the greatest amount of tax revenue to the Federal Government, is the public sales market where the offering price of the shares consists of the net asset value of the portfolio securities held by the open-end investment company plus a sales commission. The other market consists of the buying market where the shareholders who want to dispose of

their shares must sell them to the open-end investment company that has guaranteed it will purchase the shares at a redemption price equal to the net asset value of the portfolio securities held by the company. The difference in the price in the two markets is the sales commission, and since the only price the estate can get is what the investment company has guaranteed it will pay, the redemption price reflects the true and actual value of the open-end investment company shares to the estate. To include the fictitious sales commission in the value of the shares to the estate is to create an artificial value that cannot possibly be obtained by the estate in any readily accessible, realistic market.

"This dual market situation in open-end investment company shares is analogous to a stock or bond that is subject to a binding contract to purchase. The Secretary of the Treasury has covered the estate tax valuation of securities subject to a binding contract to purchase in Treas.Reg. 20.2031–2(h) (1958), which specifies that if a person in a bona fide business arrangement 'is not free to dispose of the underlying securities at other than the * * * contract price', that price can be used to determine the value of the securities for estate tax purposes. Although there is no binding contract in this case, the rationale of Treas.Reg. 20.2031–2(h) (1958) should apply to open-end investment shares because the redemption price offered by the company truly represents the only realistic value that the estate can obtain for the shares of the open-end investment company."

In *Davis*, Judge Hauk discussed both Estate of Wells and *Howell*, and, in electing not to follow those decisions, said:

"We come away from careful analysis of both *Wells* and *Howell* strengthened in our conviction that the only true, actual, realistic value to the estate of the open-end investment company

shares held by the Davis Estate here is the redemption price guaranteed by the investment company, Affiliated Fund Inc."

Cartwright v. United States, (1971)(D.C.N.Y.) 323 F.Supp. 769, discusses all of the foregoing cases, and, following the reasoning of *Davis*, holds the regulation to be unreasonable and invalid. Judge Curtin adopted the two market approach and said:

"If an individual acquires shares in the funds through purchase, he realizes at the time of the original acquisition that he is paying a load charge. He further understands that, if he later wants the company to redeem the shares, they will be redeemed on the date of redemption at the net asset value. There are no restrictions on the transferability of shares in the funds, but they are not sold in the securities market. The ordinary and only practical method of disposition is redemption. If the holder disposes of these shares during his lifetime, tax computation is based upon net asset value.

. . . . . .

"Prior to the promulgation of Regulation 20.2031–8(b)(1963), effective after April 10, 1963, there was no regulation specifying how shares in mutual funds should be valued for estate tax purposes. From 1940, when the Investment Company Act became effective, until the early 1960's, the Commissioner had no fixed policy for the valuation of mutual funds. During this period of time, the taxpayer could value the shares at redemption price if he desired. In about the year 1962, some Revenue agents demanded that mutual fund shares in estate tax returns be valued at the asked price or at the mean between the bid and the asked price. However, after taxpayers filed refund actions, the government accepted the bid prices as the fair market value and settled the cases. . . .

(Judge Curtin then discusses valuation principles and the theories advanced by the government in support of its argument.)

"History lends little support to the government's argument that the regulation was designed to bring the valuation of mutual fund shares into harmony with such decisions as Guggenheim v. Rasquin. . . . It is clear that the regulation cannot be deemed a contemporaneous construction of the statute."

■ We agree with all that is said in *Davis* and *Cartwright* except that we do not think that there are "two markets" for investment trust shares. In our view, there is only one market. That is the market for the original sale of the shares, but the sales contract is that the buyer buys at one price, and as part and parcel of the same contract, agrees to sell at a lesser price, as the latter price may be affected by changes in market conditions. Viewing the contract in this light meets every test of the "willing buyer-willing seller" definition usually applied in the determination of market value. The "willing buyer" is the fully informed person who agrees to buy the shares, agreeing at that time to sell them to the fund—the only available repurchaser—at the redemption price. The "willing seller" is the fund which sells the shares at market value plus a load charge, and which agrees to buy the shares back at market less the load charge. That is the market, and it is the only market. It is a market made up of informed buyers and an informed seller, all dealing at arm's length.

This is a market concept not unknown to the law. It is one sometimes encountered in eminent domain proceedings. It is not unusual to run across a sale and purchase of land where the purchaser has negotiated a contract giving him the right to sell the land back to the original grantor at a lesser price under certain conditions. For example, an oil company may buy land for service sta-

tion use at an agreed price, but the contract is made subject to future zoning. If zoning is not obtained, the parties agree that the grantor must buy the land back at something less than the purchase price. If the government condemns that land, and if zoning has not been obtained, or if the property owner can't prove the reasonable probability of obtaining zoning, the government pays only the resale price for the land. Of course, what the government may be willing to pay in a condemnation case is in no way controlling in determining the validity of a tax regulation, but the illustration does serve to demonstrate that contracts of purchase coupled with contracts to resell are not unknown, and that when it is to its advantage, the government insists that it must be no more than the resale price.

Admitting that we do not sit as a court of review to establish that perfect tax system, logic permits no conclusion other than that this regulation is unreasonable. It taxes a value which does not exist. The load charge which is being taxed is a seller's expense; it is not an increment of value transferred to the purchaser. It differs not from any other sales expense. It would be no more illogical to say that advertising expense incurred by a seller of real estate should be tacked on to the fair cash market value of that real estate. Certainly the Commissioner would not be so bold as to contend that the cost of a non-transferrable title insurance policy should be added to the fair cash market value of real estate, but the value of investment trust shares comes far closer to being of the same breed of cat as the value of real estate than does the value of such shares come to being of the same breed as the purchase price of a life insurance policy. The Commissioner cannot cross-breed life insurance and investment trust shares by the simple expedient of discussing them in separate paragraphs of a single regulation.

Banks and trust companies almost always make a charge for setting up a rev-ocable trust to be managed by the bank or trust company. This is a load charge made by the bank, just as an investment trust loads the sales price of its shares. Upon revocation of the trust, the settlor can't recover the setup charge, but, upon death of the settlor, the setup charge isn't added to the value of the securities taxable in his estate. Upon the sale of shares in an investment trust, the owner can't recover the load charge, but the load or setup charge is illogically and unreasonably added to the value of his shares. Any half hearted differentiation between a setup charge for a revocable trust set up with a bank and a load charge made by an investment trust would be to us a distinction without a difference, because the bank's setup charge adds nothing to value and neither does the investment trust's load charge. The only real purpose of the regulation is to extract more money from the taxpayer, but when the underlying theory of a tax is to tax value, a regulation taxing something which has no value cannot be upheld. The regulation is discriminatory and it is unreasonable. The value of decedent's shares in The Colonial Fund on October 2, 1966, was $12.00075 per share, or $6,892.31 for the 574 shares of The Colonial Fund owned by decedent on the date of her death.

■ As has been noted, the Commissioner valued the Espy Ice stock at $37.44 per share, and the Court has determined that its value was $41.75 per share. The Commissioner valued the City Ice stock at $450.00 per share, and the Court has determined that its value was $306.00 per share. Lastly, the Commissioner fixed the value of the Colonial Fund shares at $12.64 per share, and the Court determined the value of those shares to be $12.00075. These determinations have caused a post trial disagreement between the parties as to the judgment which should be entered.

Plaintiff reasons that she should have the benefit of the portion of the case she

has won, but that she should not pay, directly or indirectly, any additional tax because she lost part of the case. She says that taking into account her partial victory on the City Ice stock and on the Colonial Fund shares, she is entitled to a judgment of $6,093.65. Defendant, on the other hand, while admitting that it would not be entitled to an affirmative judgment against plaintiff, says that it is entitled to the benefit of the overall result of the valuation determinations made by the Court. Defendant relies on Lewis v. Reynolds, (1932) 284 U.S. 281, 283, 52 S.Ct. 145, 146, 76 L.Ed. 293, where it was said:

> "It follows that the ultimate questions presented for decision, upon a claim for refund, is whether the taxpayer has overpaid his tax. *This involves a redetermination of the entire tax liability.* While no new assessment can be made, after the bar of the statute has fallen, the taxpayer, nevertheless, is not entitled to a refund *unless he has overpaid his tax.*" (emphasis supplied)

The Court has determined the entire tax liability, and plaintiff has not shown that she has overpaid her tax. To the contrary, under the determinations made by the Court, plaintiff's tax would be $197,737.30, and she paid $190,082.97. No new assessment can be made, and defendant is entitled to no monetary judgment in its favor, because "the bar of the statute has fallen." But, plaintiff is not entitled to a judgment in her favor, because she has not overpaid her tax. Nor does defendant's answer change this result. The pleadings merged in the pretrial order, and defendant's present position is clearly available under that order.

Accordingly, judgment shall enter dismissing plaintiff's complaint and costs are awarded defendant.