**Douglas B. CARTWRIGHT, as Executor of the Estate of Ethel B. Bennett, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Civ. No. 1968–164.**

United States District Court,
W. D. New York.

Feb. 22, 1971.

Albrecht, Maguire, Heffern & Gregg, Buffalo, N. Y. (Ralph J. Gregg & Arthur A. Russ, Jr., Buffalo, N. Y., of counsel), for plaintiff.

Johnnie M. Walters, Asst. Atty. Gen. (Donald R. Anderson & Donald T. Fish, Attys., Dept. of Justice, of counsel), Washington, D. C., and H. Kenneth Schroeder, Jr., U. S. Atty., Buffalo, N. Y., for defendant.

CURTIN, District Judge.

This action was commenced by the plaintiff to recover $3,092.59 in estate taxes and interest. The dispute arose over the proper method of valuation of mutual fund shares in an estate tax proceeding.

Ethel Bennett died testate on December 4, 1964, owning the following shares in mutual funds:

| | |
|---|---|
| Investors Mutual, Inc. | 2568.422 (in her individual name) |
| | 2067.531 (in her name as trustee for Dorothy B. Cartwright) |
| Investors Selective Fund, | 2269.376 |
| Investors Selected Fund, Inc. | 1869.159 |

Investors Mutual, Inc., Investors Stock Fund, Inc., and Investors Selective Fund, Inc. [hereinafter referred to as "the funds"] are open end investment companies registered with and subject to the regulations of the Securities and Exchange Commission. They are regulated by Sections 1 through 53 of the Investment Company Act of 1940 [15 U.S. C. §§ 80a–1 through 80a–52]. The funds were organized and are managed by Investors Diversified Services, Inc., not an open end investment company but the underwriter, distributor, and manager for the funds.

Upon the death of Ethel Bennett, her executor reported the value of the shares on the estate tax return at their net asset value, also called the bid or redemp-

tion price. The Commissioner of Internal Revenue assessed a deficiency on the estate tax, claiming that the estate tax value of these shares was the asked for or public offering price. The executor paid the deficiency on the accrued interest and, on December 6, 1967, filed a claim for refund of federal estate taxes and interest in the amount of $3,092.59.

■■ The issue is whether Treasury Regulation 20.2031–8(b) (1963),[1] which requires that shares in mutual funds be valued for estate tax purposes at the public offering or asked price on the date of death, is reasonable. Plaintiff's position is that the shares should be valued at the redemption price.

The court has considered the extensive stipulation of facts, testimony of witnesses, and the briefs filed by the parties. The following constitutes the findings of fact and conclusions of law.

The regulation was held reasonable and its application by the Commissioner was upheld in Estate of Wells v. Commissioner of Internal Revenue, 50 T.C. 871 (1968) (six judges dissenting), aff'd. as Ruehlmann v. Commissioner, 418 F.2d 1302 (6th Cir. 1969), and in

Howell v. United States, 290 F.Supp. 690 (N.D.Ind.1968), aff'd. 414 F.2d 45 (7th Cir. 1969). However, in Davis v. United States, 306 F.Supp. 949 (D.C.1969), the court held that the regulation was unreasonable and found for the plaintiff. That decision is on appeal to the Ninth Circuit.

If Treasury Regulation 20.2031–8(b) is reasonable, it must be upheld by the court [United States v. Correll, 389 U.S. 299, 306–307, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967)], even if another method of valuing the shares would conform to the statute [Mearkle's Estate v. Commissioner of Internal Revenue, 129 F.2d 386, 388–389 (3d Cir. 1942)].

The price at which shares in the funds are sold to the investor is the current public offering price or asked price, which is determined by adding the net asset value and the load or sales charge. The net asset value of a share is computed by adding the market value of all securities and other assets owned by the fund and subtracting the liabilities of the fund and dividing that figure by the then total outstanding shares. The load charge usually covers the cost of ex-

1. Sec. 20.2031–8.

\* \* \* \* \*

(b) *Valuation of shares in an open-end investment company.* (1) The fair market value of a share in an open-end investment company (commonly known as a "mutual fund") is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. If the alternate valuation under section 2032 is elected, the last public offering price quoted by the company for the alternate valuation date shall be the applicable public offering price. If there is no public offering price quoted by the company for the applicable valuation date (e. g., the valuation date is a Saturday, Sunday, or holiday), the fair market value of the mutual fund

share is the last public offering price quoted by the company for the first day preceding the applicable valuation date for which there is a quotation, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In any case where a dividend is declared on a share in an open-end investment company before the decedent's death but payable to shareholders of record on a date after his death and the share is selling "ex-dividend" on the date of the decedent's death, the amount of the dividend is added to the ex-dividend quotation in determining the fair market value of the share as of the date of the decedent's death. As used in this paragraph, the term "open-end investment company" includes only a company which on the applicable valuation date was engaged in offering its shares to the public in the capacity of an open-end investment company.

(2) The provisions of this paragraph shall apply with respect to estates of decedents dying after October 10, 1963.

penses and profit to the broker,[2] but does not include any management fee. The redemption price or bid price is the current net asset value and does not include the load charge. Ethel Bennett acquired her shares by gift, inheritance, and by purchase at the bid price by reinvesting her capital gains and ordinary dividends. She did not acquire any shares by purchase at the asked price.

If an individual acquires shares in the funds through purchase, he realizes at the time of the original acquisition that he is paying a load charge. He further understands that, if he later wants the company to redeem the shares, they will be redeemed on the date of redemption at the net asset value. There are no restrictions on the transferability of shares in the funds, but they are not sold in the securities market. The ordinary and only practical method of disposition is redemption. If the holder disposes of these shares during his lifetime, tax computation is based upon net asset value.

Provisions similar to Section 2031(a) of the Internal Revenue Code of 1954 [26 U.S.C. § 2031(a)], which requires that the gross estate of a decedent shall be determined by including the value of all of his property at the time of death have appeared in the Revenue Act since 1916. Prior to the promulgation of Regulation 20.2031–8(b) (1963), effective after April 10, 1963, there was no regulation specifying how shares in mutual funds should be valued for estate tax purposes. From 1940, when the Investment Company Act became effective, until the early 1960's, the Commissioner had no fixed policy for the valuation of mutual funds. During this period of time, the taxpayer could value the shares at redemption price if he desired. In about the year 1962, some Revenue agents demanded that mutual fund shares in estate tax returns be valued at the asked price or at the mean between the bid and the asked price. However, after taxpayers filed refund actions, the government accepted the bid prices as the fair market value and settled the cases.[3]

The government bases its argument of reasonableness of Treasury Regulation 20.2031–8(b) (1963) on several grounds. The first is that the regulation applies the general principle of valuation expressed in Treasury Regulation 20.-2031–1(b) to the valuation of mutual fund shares. Secondly, it brings the valuation of these shares into harmony with cases like Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813 (1941), which held that replacement cost rather than cash surrender value is the correct measure of value of a single premium insurance contract. Thirdly, the argument for reasonableness is based on the fact that no hardship is imposed on the estate or the beneficiaries if they dispose of the shares at a loss. Treasury Regulation Section 20.2053–3(d) (2).[4]

---

2. Shares of some mutual funds may be purchased at a public offering price equal to the net asset value. There is no load charge because the companies maintain no dealer organization or staff of sales representatives. Investors are not solicited but must apply directly to the underwriter. The shares of Scudder, Stevens & Clark Fund, Loomis-Sayles Fund, and Stein, Roe & Farnham Fund may be purchased without a load charge.

3. The following are some examples of cases the government settled: Two actions were started in the United States District Court for the Western District of New York. In Wink, as Executor of the Estate of Baldwin, v. Coyle, Civil 9864, the Commissioner valued the shares on the mean between the bid and the asked price. In Metz, as Executor of the Estate of Stern, Civil 10,167, the Commissioner valued the shares at the asked price. On October 11, 1963, the case of Estate of Wilder v. Tomlinson was filed in the Middle District of Florida. All three cases were settled by the refund to the taxpayer of the excess tax collected.

4. Sec. 20.2053–3(d).
* * * * *
(2) Expenses for selling property of the estate are deductible if the sale is necessary in order to pay the decedent's debts, expenses of administration, or taxes, to

The government, citing Commissioner of Internal Revenue v. South Texas ·Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831 (1948), argues that, since the "Regulations constitute a contemporaneous construction by those charged with the administration of the revenue statutes [it] should not be overruled except for weighty reasons."

The general principle of valuation expressed in Treasury Regulation 20.2031–1(b) defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." The government's position is that the only time that the willing buyer-willing seller situation exists in the sale of mutual fund shares is at the time of original sale by the investment company to purchaser. At the time of redemption sale, since the company is under an obligation of law to purchase at the net asset value, it is not a willing buyer, and quite often, since the circumstances of the owner of the shares compel the sale, he is not a willing seller.

This theory disregards the facts of acquisition in many cases, including this one. Mrs. Bennett acquired her shares either by gift, inheritance, or by acquisition at the redemption price, and none at the asked price. It also disregards the fact that, at the time of original purchase, the buyer is fully aware that, at the time of sale back to the company, he will be able to sell the shares back at the net asset value or redemption price, what-

ever it may be at that time. At the time of original purchase, both the buyer and seller are fully cognizant of the facts and willingly enter into the transaction.

As the court pointed out in Davis v. United States, supra, there are two separate markets. The difference in the price in the two markets is the sales commission. To include that in the value of the shares to the estate creates an artificial value that cannot possibly be obtained by the estate in any readily accessible market. The sales commission is for the expense of advertising and marketing only, and adds nothing to the value of the share.

In order to show the reasonableness of the regulation that replacement cost of the mutual fund share, rather than the redemption price, is the correct measure of value, the government cites Guggenheim v. Rasquin, *supra*. In that case, the taxpayer purchased a single premium life insurance policy for $852,438.50 at the face value of $1,000,000.00. A short time later, she gave the policy to her children. On the gift tax return, she listed the policies at their cash surrender value of $717,344.81. The Commissioner's valuation of the gift at cost of $852,438.50 was upheld by the Supreme Court. The Supreme Court was persuaded by the facts that the owner of the fully paid life insurance policy not only had the right to surrender it, but the right to receive the face amount of the policy upon the insured's death. The court pointed out:

"An important element in the value of the property is the use to which it

preserve the estate, or to effect distribution. The phrase "expenses for selling property" includes brokerage fees and other expenses attending the sale, such as the fees of an auctioneer if it is reasonably necessary to employ one. Where an item included in the gross estate is disposed of in a bona fide sale (including a redemption) to a dealer in such items at a price below its fair market value, for purposes of this paragraph there shall be treated as an expense for selling the item whichever of the following amounts is the lesser: (i) the

amount by which the fair market value of the property on the applicable valuation date exceeds the proceeds of the sale, or (ii) the amount by which the fair market value of the property on the date of the sale exceeds the proceeds of the sale. The principles used in determining the value at which an item of property is included in the gross estate shall be followed in arriving at the fair market value of the property for purposes of this paragraph. See §§ 20.2031–1 through 20.2031–9.

may be put. Certainly the petitioner here did not expend $852,438.50 to make an immediate gift limited to $717,344.81. Presumptively the value of these policies at the date of the gift was the amount which the insured had expended to acquire them."

The government argues that *Guggenheim* stands for the principle that, in valuing mutual fund shares, not only the redemption price but the entire bundle of rights which the estate receives must be taken into account. The bundle of rights in *Guggenheim* included the right to receive the face value of the policy at the time of death, and a certainty of insurance coverage if Mrs. Guggenheim became uninsurable.

It appears to this court that the Commissioner's attempt to remold the facts and law of *Guggenheim* to fit the problem of valuation of mutual fund shares is unrealistic and unreasonable.

No doubt there are advantages in holding mutual funds, but mutual funds and insurance policies are so different that the bundle of rights in each cannot be compared.

The value of mutual fund shares fluctuates with the stock market, but an insurance contract has a fixed value. An individual may purchase mutual funds whatever his age or his state of health. However, the question of insurability is an important consideration both to insurance companies and to the holders of insurance policies. Because it is difficult for many individuals to obtain life insurance coverage, the purchase of a life insurance policy is a valuable right. There is no comparable consideration in the purchase of mutual fund shares.

The event of death itself brings about no change in value of a mutual fund share. No payment of any kind is made unless the estate or beneficiary presents the share for redemption. On the other hand, when death occurs, the insurance company pays under the policy, the estate tax is paid, and that is the end of it. Mutual fund shares can pass from estate to estate with a tax paid on each transfer. By Regulation 20.2031–8(b) (1963), the government collects an added tax on the load charge at the time of each transfer. Is it reasonable for this tax to be paid again and again, imposed on the load charge, which adds nothing to the value of the share but pays only for marketing and advertising costs?

The government's argument that no hardship is imposed upon the estate or beneficiaries by this regulation if they dispose of the shares is not convincing. Treasury Regulation 20.2053–3(d) (2), which provides that, if the shares are sold at a loss, the loss is a deductible expense of administration, is of no benefit to the estate or to the beneficiary which does not sell the shares. Furthermore, as the dissent points out in Wells v. Commissioner, *supra*, the loss may be taken only under certain limited circumstances. In addition, if the regulation setting fair market value is unreasonable, this unreasonableness cannot be cured by a regulation which limits the hardship imposed upon a taxpayer.

History lends little support to the government's argument that the regulation was designed to bring the valuation of mutual fund shares into harmony with such decisions as Guggenheim v. Rasquin, *supra*; Powers v. Commissioner of Internal Revenue, 312 U.S. 259, 61 S. Ct. 509, 85 L.Ed. 817 (1941); United States v. Ryerson, 312 U.S. 260, 61 S.Ct. 479, 85 L.Ed. 819 (1941); and Dupont Estate v. Commissioner of Internal Revenue, 3 Cir., 233 F.2d 210, cert. denied, 352 U.S. 878, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956). Three of these cases were decided in 1941, and the *Dupont* case, decided in 1956, merely applied the rationale of the *Guggenheim* gift tax case to an estate tax case.

In similar fashion, it is clear that the regulation cannot be deemed a contemporaneous construction of the statute. The statutory definition of value has been in the Revenue Act since 1916, and this regulation was not promulgated until 1963.

For these reasons, the court determines that Treasury Regulation 20.2031–

8(b) (1963) is unreasonable. Judgment shall enter for the plaintiff.

Prepare judgment on notice.

So ordered.