Douglas B. CARTWRIGHT, as Executor
of the Estate of Ethel B. Bennett,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 73, Docket 71-1542.

United States Court of Appeals,
Second Circuit.

Argued Nov. 4, 1971.

Decided March 27, 1972.

Ralph J. Gregg, George M. Zimmermann, Arthur A. Russ, Jr., Albrecht, Maguire, Heffern & Gregg, of counsel, Buffalo, N. Y., for plaintiff-appellee.

Loring W. Post, Meyer Rothwacks, David English Carmack, Attys., Tax. Div., Dept. of Justice, Johnnie M. Walters, Asst. Atty. Gen., H. Kenneth Schroeder, Jr., U. S. Atty., C. Donald O'Connor, Asst. U. S. Atty., for defendant-appellant.

Before WATERMAN, SMITH and TIMBERS, Circuit Judges.

WATERMAN, Circuit Judge:

We are called upon to decide whether Section 20.2031–8(b) (1963) of the Treasury Regulations on Estate Tax (1954) which requires that shares of open-end investment companies (mutual funds) are to be valued for estate tax purposes at the public offering or publicly posted asked price is a reasonable regulation. The issue reaches us by a government appeal from a decision of Judge John T. Curtin in the United States District Court for the Western District of New York, reported at 323 F.Supp. 769 (1971), in which the district court held that the regulation was unreasonable. We agree with the court below and affirm the judgment below.

We need not belabor the facts involved in this dispute for they are well set out in the lower court opinion. Ethel Bennett died testate owning shares in three mutual funds which are registered with, and subject to the regulations of, the Securities and Exchange Commission. Upon her death the executor of her estate, Douglas B. Cartwright, filed an estate tax return reporting the value of those shares at their net asset value,[1] that is, at their bid or redemption price. As we have noted, Treasury Regulation 20.2031–8(b) set forth in the margin,[2] requires that shares in such funds be valued at their public offering price, and, accordingly, the Commissioner of Internal Revenue assessed a deficiency. The executor paid the assessed deficiency, and then, alleging overpayment of the tax, on December 6, 1967 filed his claim under 28 U.S.C. §§ 1340 and 1346 in the district court for a refund of $3,092.59. In this case the public offering price is the price at which the shares in the mutual funds are marketed and distributed by Investors Diversified Services, Inc. (IDS). IDS is not an open-end investment company but, rath-

---

1. Though the term "net asset value" is fairly self-explanatory, the parties also stipulated to its meaning:

    9. The "net asset value" is computed daily as of the close of trading on the New York Stock Exchange. The total assets are valued and the total outstanding liabilities, including all reserves and accrued expenses, are subtracted. The resulting net worth is divided by the number of shares outstanding to determine the "net asset value" per share of capital stock. This is generally described as the "bid" price in the financial pages.

2. Regulation 20.2031–8(b) reads:

    (b) Valuation of shares in an open-end investment company. (1) The fair market value of a share in an open-end investment company (commonly known as a "mutual fund") is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. If the alternate valuation under section 2032 is elected, the last public offering price quoted by the company for the alternate valuation date shall be the applicable public offering price. If there is no public offering price quoted by the company for the applicable valuation date (e. g., the valuation date is a Saturday, Sunday, or holiday), the fair market value of the mutual fund share is the last public offering price quoted by the company for the first day preceding the applicable valuation date for which there is a quotation, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In any case where a dividend is declared on a share in an open-end investment company before the decedent's death but payable to shareholders of record on a date after his death and the share is selling "ex-dividend" on the date of the decedent's death, the amount of the dividend is added to the ex-dividend quotation in determining the fair market value of the share as of the date of the decedent's death. As used in this paragraph, the term "open-end investment company" includes only a company which on the applicable valuation date was engaged in offering its shares to the public in the capacity of an open-end investment company.

er, in addition to its functions of organizing and managing the funds herein involved, it acts in a capacity which is analogous to that of a stockbroker. Shares in the mutual funds organized by IDS are obtained initially by purchase through IDS at a price equal to the net asset value of the shares plus a fee called the sales load or load charge. As found by the court below in 323 F.Supp. at 770–771, the load charge "usually covers the cost of expenses and profit to the broker . . . . [footnote omitted]" The nature of the sales is further clarified by the parties' stipulation of facts for the proceedings below:

IDS is required by § 22(d) of the Investment Company Act of 1940, 15 U. S.C. § 80a–22, to sell shares in these registered investment companies at the current public offering price described in the prospectus (in this instance net asset value plus a maximum sales charge of 8% of the public offering price). IDS receives, in full payment for its services as distributor of these shares, a distribution fee equal to the amount by which the public offering price exceeds net asset value (a sales charge of a maximum of 8% of the public offering price with lesser percentages applying for quantity sales). The remainder of the purchase price is the "net asset value" which is remitted to the investment company. From its fee, IDS pays commission to its sales representatives and other expenses incident to or in connection with the distribution and sale of the investment companies stock.

The cost the investor paid for the sales load is thereafter lost to him, for the ordinary, and, indeed, the only practical, method of disposing of the shares is through redemption by the company, and shares are redeemed at their net asset value as of the date of redemption.

Appellee disregarded Regulation 20.2031–8(b) and did not include the cost of the sales load as part of the value of his decedent's mutual fund shares, and thereafter, as stated above, the Commissioner of Internal Revenue assessed a deficiency.

As was observed by the district court at 323 F.Supp. 770:

If Treasury Regulation 20.2031–8 (b) is reasonable, it must be upheld by the court [United States v. Correll, 389 U.S. 299, 306–307, 88 S. Ct. 445, 19 L.Ed.2d 537 (1967)], even if another method of valuing the shares would conform to the statute [Mearkle's Estate v. Commissioner of Internal Revenue, 129 F.2d 386, 388–389 (3d Cir. 1942)].

The application of a standard of "reasonableness" to the regulation under consideration has produced varied results. The regulation has been previously considered and held valid in Ruehlmann v. Commissioner of Internal Revenue, 418 F.2d 1302 (6 Cir. 1969), affirming the Tax Court, 50 T.C. 871 (1968), cert. denied, 398 U.S. 950, 90 S. Ct. 1869, 26 L.Ed.2d 290 (1970), rehearing denied, 400 U.S. 856, 91 S.Ct. 24, 27 L.Ed.2d 95 (1970). In Howell v. United States, 414 F.2d 45 (7 Cir. 1969), the companion gift tax regulation (Section 25.2512–6(b) (1968) ) was held valid. Contrary-wise, in Davis v. United States, 306 F.Supp. 949 (C.D.Cal.1969), now on appeal by the Government to the Ninth Circuit (No. 25,736), the district court held that the regulation was unreasonable. Moreover, since Judge Curtin handed down his decision in the instant case, Judge Winner in the United States District Court for the District of Colorado has also ruled in Hicks v. United States, 335 F.Supp. 474 (1971) that the regulation is unreasonable.

We note that here the Government primarily rests on the same arguments as those it advanced in the court below. Here, as in the district court, the Government has two main bases for supporting its contention that it is reasonable for estate tax purposes to value mutual fund shares at an amount greater than that which the owner could reasonably expect to receive for them. First, it argues that, under the circum-

stances peculiar to mutual fund shares, the challenged regulation is in line with the general principles of valuation set out in Treasury Regulation 20.2031–1 (b).[3] Second, the Government seeks to analogize its method of valuing shares in mutual funds to the method of valuing single premium insurance policies sustained by the Supreme Court in Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813 (1941). These two main lines of the Government's argument were adequately refuted in Judge Curtin's opinion below and we fully concur in his reasoning disposing of them. We will not restate the district court's conclusions found in 323 F.Supp. at 772–773, but instead address ourselves to some of the more peripheral issues the Government raises on appeal.

The Government forcefully contends that mutual fund shares have a value beyond the redemption price and that that value is reasonably measured by the added amount represented by the load charge. We quote from page 17 of its brief: "The estate and the decedent's beneficiaries may continue to own the mutual fund shares, which provide not only the right to redeem, but also the right to retain the property for its investment features, which include the possibility of capital gains and dividends which may be used to purchase additional shares at less than the public offering price . . ., the diversification of investment for a small outlay, and expert management." This argument applies with equal force to the shares of numbers of corporations listed on the stock exchanges, not only to the mutual fund shares. Clearly, the commissions paid to brokers when shares in these companies are bought or sold are not in payment for, or a measure of, the value beyond the resale price, but are rather simply compensation to the broker for his services. The fallacy in the Government's

3. Regulation 20.2031–1(b) in pertinent part reads:

> (b) Valuation of property in general. The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death, except that if the executor elects the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item whereever appropriate. Thus, in the case of an item of property includible in the decedent's gross estate, which is generally obtained by the public in the retail market, the fair market value of such an item of property is the price at which the item or a comparable item would be sold at retail. For example, the fair market value of an automobile (an article generally obtained by the public in the retail market) includible in the decedent's gross estate is the price for which an automobile of the same or approximately the same description, make, model, age, condition, etc., could be purchased by a member of the general public and not the price for which the particular automobile of the decedent would be purchased by a dealer in used automobiles. Examples of items of property which are generally sold to the public at retail may be found in §§ 20.2031–6 and 20.2031–8. The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of property. For example, in the case of shares of stock or bonds, such unit of property is generally a share of stock or a bond. Livestock, farm machinery, harvested and growing crops must generally be itemized and the value of each item separately returned. Property shall not be returned at the value at which it is assessed for local tax purposes unless that value represents the fair market value as of the applicable valuation date. All relevant facts and elements of value as of the applicable valuation date shall be considered in every case.

position was demonstrated by Tax Court Judge Tannenwald when he spoke for the minority of the Tax Court in Wells v. Commissioner, 50 T.C. 871, 880 (1968).[4] That court by a vote of 7 to 6 held the regulation in issue here to be a reasonable one. Judge Tannenwald stated:

> The emphasis by the majority on the fact that the estate and the beneficiaries may continue to own the mutual fund shares and thereby enjoy the benefits of ownership is, in my opinion, wholly misplaced. These possibilities exist with respect to every type of security. If the majority standard is correct, it would be no less "appropriate" to use replacement cost with respect to marketable securities of all kinds. This, however, is simply not the law. That there may be an equivalence of replacement cost and fair market value in some situations does not justify the substitution of the former for the latter as the criterion in other situations where different considerations are involved.

■ The Government suggests that the challenged regulation only applies a general principle of valuation to the valuation of mutual fund shares, viz., a unit of property is worth what a purchaser would have to pay to obtain similar property in the open market, that is, its retail price, and points to Treasury Regulation 20.2031–1(b)[5] as support for the suggestion. However, if there is indeed a widely accepted principle of valuation contained within that recently revised regulation, it is most certainly embodied in the sentence, "All relevant facts and elements of value as of the applicable valuation date shall be considered in ev-

ery case." We would agree with the Ruehlmann case, supra 418 F.2d at 1034, that the retail sales price of a property unit may be an important factor in the determination of its fair market value; yet it is also clear that other factors can affect the price which a willing seller reasonably could expect to receive from a sale of that particular unit, and if these other factors cause the retail price to be an unreasonable or unrealistic value standard, the retail price has not always been followed in valuation disputes as the sole criterion of value.[6]

In his dissent in Wells, supra 50 T.C. at 878, Judge Tannenwald cited two examples of this principle which we find very persuasive. He pointed out that "when the open-market price of bonds is less than par but the bonds can be applied at par in payment of the decedent's estate tax, the par value is includable in the gross estate. Bankers Trust Co. v. United States, 284 F.2d 537 (C.A.2, 1960), certiorari denied 366 U.S. 903, 81 S.Ct. 1047, 6 L.Ed.2d 204 (1961); Candler v. United States, 303 F.2d 439 (C.A.5, 1962)." He also found support for the principle in a Treasury Regulation relating to an area which is strikingly similar to that in the present case, a regulation relative to the valuation of shares of corporate stock which are subject to a restrictive agreement that they cannot be sold unless first offered to the corporation itself, or to a third person, at a specified price. If such a restriction upon the transfer of stock is created in an arm's length transaction, Treasury Regulation 20.2031–2(h) (1958) requires that the price so specified be determined to be the fair market value of the shares.[7]

---

4. The majority decision was affirmed in Ruehlmann v. Commissioner of Internal Revenue, 418 F.2d 1302 (6 Cir. 1969), cert. denied, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970).

5. See Footnote 3.

6. Duke v. Commissioner of Internal Revenue, 2 Cir., 200 F.2d 82 (1952), cited by the Government, in no way contradicts that principle, for, as was pointed out by

Judge Frank in that opinion, in Duke there was no evidence of the fair market value of the property in question other than its retail value.

7. The district court in the Davis case thought that the situations were so similar that similar treatment was required. To quote the court in that case in 306 F.Supp. at 955: "Although there is no binding contract in this case, the ration-

Thus according to generally accepted principles of valuation, the Government's theories of retail value should not be applied in this case. As we have stated, fair market valuation requires that consideration be accorded to all factors affecting the value of the property and not the retail sales price alone. Obviously, here, the estate can realistically expect to receive only the net asset value of the shares, not the price the general public would pay for them. We therefore agree with the court below that Treasury Regulation 20.2031–8(b) is an unreasonable regulation.

The lower court judgment for taxpayer is affirmed.

ale of Treas.Reg. 20.2031–2(h) (1958) should apply to the open-end investment shares because the redemption price offered by the company truly represents the only realistic value that the estate can obtain for the shares of the open-end investment company."