T.C. Memo. 1996-395

UNITED STATES TAX COURT

ESTATE OF JAMES BARUDIN, DECEASED, MURIEL B. CLARKE, EXECUTRIX,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7156-94.                    Filed August 26, 1996.

<u>Jeffrey M. Novick</u>, <u>Richard S. Kestenbaum</u>, and <u>Bernard S. Mark</u>, for petitioner.

<u>Dante D. Lucas</u> and <u>Pamela L. Cohen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined a deficiency of $163,751 in the Federal estate tax of the Estate of James Barudin (decedent).

Unless otherwise indicated, all section references are to the Internal Revenue Code as of December 31, 1989, the date of decedent's death.

After settlement of some issues, the only issue for decision is the proper date-of-death value of decedent's ownership unit in a partnership that owned real property in New York City.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petition was filed, petitioner's legal residence was in New York, New York.

### The 225 Fourth Co. Partnership

In 1954, a group of investors including decedent organized a general partnership under the laws of the State of New York by the name of The 225 Fourth Co. Partnership (the FC Partnership) for the purpose of purchasing two commercial office buildings and land located at 225 and 233 Park Avenue South, Manhattan, New York (the Partnership Properties).

The Partnership Properties occupy the entire block on the east side of Park Avenue South between East 18th Street and East 19th Street. The Partnership Properties are located in a neighborhood of Manhattan referred to as Midtown South. Generally, office space that is located in Midtown South and that is available for lease is regarded as secondary, as opposed to primary, office space.

The only significant assets of the FC Partnership consist of the Partnership Properties.

As of 1981, investors owned a total of 48 general partnership units (ownership units) in the FC Partnership. Decedent owned one ownership unit in the FC Partnership.

Under the terms of the partnership agreement, ownership units could not be sold or transferred without consent of a majority of the partners. In order to sell or mortgage the Partnership Properties, consent of two-thirds of the partners was required.

Loans or mortgages obtained on the Partnership Properties were to be nonrecourse as to the general partners. The general partners, however, could be required to contribute to the FC Partnership additional capital for any purpose approved by a majority of the partners.

Since organization of the FC Partnership in 1954 until the date of trial, the FC Partnership and the Partnership Properties have been managed by Orda Management Corp. (Orda Management). Orda Management was responsible for making improvements to and repairs on the Partnership Properties, for negotiating leases of the Partnership Properties, for hiring brokers, attorneys, and accountants, for obtaining casualty and liability insurance on the properties, and for managing the general business affairs of the FC Partnership.

From approximately 1979 until the date of trial, Morton Silver (Mr. Silver) has owned and functioned as president of Orda Management.  Apparently, from its organization in 1954, Mr. Silver also has owned ownership units in the FC Partnership.

From at least 1954 through 1981, space in the Partnership Properties was generally leased out for light manufacturing and industrial purposes.

By 1981, the two buildings located on the Partnership Properties were old and in poor condition, and they did not command lease rates as high as other typical secondary office space in Midtown South.  In 1981, the FC Partnership realized net income of approximately $300,000 from rental of the Partnership Properties.

In 1981, the City University of New York (CUNY) agreed to lease four floors of the Partnership Properties consisting of approximately 88,000 square feet for office and classroom space.  CUNY's lease, for a term of 10 years, was to begin in the summer of 1982 and was due to expire in the spring of 1992.  As part of the lease agreement with CUNY, the FC Partnership agreed to renovate the lobbies of the two buildings and the four floors to be leased by CUNY and recouped portions of these capital expenditures through the annual lease charges to CUNY.

In January of 1982, a capital contribution of $4,895,833 was made to the FC Partnership by Silver-Park Co. (Silver Park), a New York limited partnership of which Mr. Silver was the general

partner.  This $4,895,833 capital contribution was made to fund necessary repairs and renovations to upgrade the Partnership Properties.

As a result of Silver Park's $4,895,833 capital contribution in 1982, Silver Park became a general partner in the FC Partnership, and the FC Partnership's ownership structure was changed in 1982 to consist of 95 ownership units, of which the original general partners owned 48 units, or 50.53 percent, and Silver Park owned 47 units, or 49.47 percent.

As a result of the change in ownership of the FC Partnership, decedent's one-forty-eighth interest in the FC partnership was converted to a one-ninety-fifth interest.

As sole general partner of Silver Park, Mr. Silver was able to vote on FC Partnership matters on behalf of 47 of the 95 ownership units.  As of 1986, Mr. Silver controlled an additional seven ownership units, giving him control of 54 of the total 95 ownership units.  By controlling a majority of the ownership units in the FC Partnership, Mr. Silver alone had authority to determine to whom partners could transfer ownership units, and he could make most decisions affecting management and operation of the FC Partnership.

By 1984, the FC Partnership had executed two additional lease agreements with CUNY.  The leases with CUNY involved approximately 40 percent of the total office space available in the Partnership Properties.

The leases with CUNY were due to expire in 1992, 1993, and 1994. CUNY, however, could terminate the leases in 1990 provided CUNY gave 12 months' advance notice. Further, if, for any year, CUNY's budget was not approved, CUNY's leases with the FC Partnership would automatically terminate on the last day of CUNY's current fiscal year.

In addition to CUNY, other tenants of office space in the Partnership Properties included Manufacturers Hanover Trust Co., Crown Books Corp., American Skandia Life Assurance Corp., STV Seellye Stevenson Value & Knecht, and Guardian Life Insurance Co. of America. During 1988, of the 555,015 square feet in the Partnership Properties, 535,635 square feet (or 97 percent) were leased.

From 1982 through 1988, lease income from the Partnership Properties increased each year.

In 1989, total lease income of $16,058,359 was received from the Partnership Properties. Of this amount, $2,091,410 represented payments the tenants as a whole were charged with respect to capital expenditures the partnership had made on renovating the Partnership Properties.

Cash distributions to each partner of the FC Partnership increased from approximately $10,000 per ownership unit in 1982 to approximately $40,000 per ownership unit in 1986.

In each of the succeeding 3 years (namely, 1987, 1988, and 1989), regular cash distributions to each of the partners of the

FC Partnership remained at $40,000 for each ownership unit.

In July 1988, when the New York City real estate market was thriving, the FC Partnership refinanced its mortgage on the Partnership Properties. As a result of additional funds that were available to the FC Partnership from this refinancing, the FC Partnership made a special cash distribution of $140,000 to each general partner with respect to each ownership unit in the partnership.

In 1988, for purposes of refinancing its mortgage, the FC Partnership obtained from Cushman & Wakefield, Inc. (C&W), an appraisal of the Partnership Properties (1988 C&W report). Using for its methodology comparable sales and income capitalization and assuming that economic conditions and the New York City commercial real estate market would continue to improve, the 1988 C&W report concluded that, as of May 9, 1988, the estimated fair market value of the underlying Partnership Properties equaled $110 million. The 1988 C&W report did not attempt to value the FC Partnership, nor an ownership unit in the FC Partnership.

In the spring of 1989, Mr. Silver was informed that CUNY had decided to build its own campus and that when the new campus was completed in 1994, CUNY would terminate a large portion of its lease of the Partnership Properties.

During the early and mid-1980's, real estate leasing activity in midtown Manhattan increased each year.

In 1987 and 1988, although lease rates for prime office space in midtown Manhattan rose slightly each year, lease rates remained relatively the same for secondary office space. During these same years, vacancy rates for both primary and secondary office space in midtown Manhattan increased.

By 1989, real estate leasing activity in midtown Manhattan declined. By the end of 1989, New York City's economy was experiencing a recession.

Decedent's Assignment of Ownership Unit

In January of 1986, decedent assigned to his daughter, Muriel Clarke, a remainder interest in his one ownership unit in the FC Partnership, retaining for the remainder of his life all income, dividends, and distributions received in connection with this ownership unit.

On April 15, 1986, decedent filed a Federal gift tax return with respect to the assignment to his daughter of a remainder interest in his one ownership unit in the FC Partnership. Using a liquidation value for the FC partnership of $19,953,778 and a 20-percent minority interest discount, and computing the value of the remainder interest assigned to his daughter at 82 percent of the $168,421 value computed for the ownership unit, the remainder interest in the ownership unit that decedent assigned to his daughter in 1986 was valued on decedent's 1986 Federal gift tax return at $146,302.

Estate Tax Return and Respondent's Audit

As indicated, decedent died on December 31, 1989.

In spite of decedent's April 1986 assignment to his daughter of a remainder interest in his ownership unit in the FC Partnership, petitioner agrees that, for Federal estate tax purposes and pursuant to section 2036(a)(1), the date-of-death value of decedent's ownership unit in the FC Partnership is includable in decedent's gross estate. Accordingly, on petitioner's Federal estate tax return, the ownership unit was included in decedent's gross estate at a December 31, 1989, date-of-death value of $280,000. The record does not reflect how the $280,000 date-of-death value was calculated.

On audit of petitioner's Federal estate tax return, respondent determined that decedent's ownership unit in the FC Partnership should be included in decedent's gross estate at a December 31, 1989, date-of-death value of $721,960.

Prior to trial, both petitioner and respondent revised their respective assertions for the December 31, 1989, date-of-death value of decedent's ownership unit in the FC Partnership. Petitioner now asserts that the date-of-death value of decedent's ownership unit equaled $200,000, and respondent asserts that the date-of-death value of decedent's ownership unit equaled $596,000.

- 10 -

OPINION

Generally, the fair market value of property transferred by a decedent with respect to which the decedent retains for life the right to income from the property is includable in the gross estate. Sec. 2036(a)(1). Fair market value is defined generally as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.

In determining the fair market value of property includable in a decedent's gross estate, we are to consider all relevant facts and circumstances. Cartwright v. United States, 457 F.2d 567, 571 (2d Cir. 1972), affd. 411 U.S. 546 (1973); Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); sec. 20.2031-1(b), Estate Tax Regs.

In determining the fair market value of decedent's ownership unit in the FC Partnership, petitioner's and respondent's expert witnesses agree that discounts are appropriate to reflect the minority status and the lack of marketability of decedent's one ownership unit. See Richardson v. Commissioner, 151 F.2d 102, 105 (2d Cir. 1945), affg. a Memorandum Opinion of this Court dated Nov. 30, 1943; Estate of Newhouse v. Commissioner, 94 T.C. 193, 249 (1990); Harwood v. Commissioner, 82 T.C. 239, 267-268

(1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986); Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996); Moore v. Commissioner, T.C. Memo. 1991-546.

Petitioner's and respondent's experts use similar basic steps to value decedent's ownership unit in the FC Partnership. The experts: (1) Estimate the December 31, 1989, fair market value of the underlying Partnership Properties; (2) convert that value into a partnership liquidation value; (3) divide the partnership liquidation value by 95 to calculate the liquidation value of decedent's one ownership unit; and (4) apply their respective combined minority-interest and lack-of-marketability discounts to the liquidation value of decedent's one ownership unit.

The major points of disagreement between petitioner's and respondent's experts relate to the fair market value of the underlying Partnership Properties and to the amount of the discounts to apply that would approximately reflect the minority status and lack of marketability of decedent's ownership unit.

The schedule below summarizes each of the experts' valuations of the underlying Partnership Properties as of December 31, 1989, the discounts they apply, and their respective ultimate date-of-death valuations of decedent's ownership unit in the FC Partnership:

| Valuation of Partnership Properties Before Discounts: | Petitioner's Expert | Respondent's Expert |
|---|---|---|
| Estimated Gross Annual Lease Income | $15,082,200 | $16,345,491 |
| Contingency Loss Reserve | 5% | 1% |
| Operating Expenses | $6,650,193 | $6,920,501 |
| Estimated Annual Lease Income | $8,432,007 | $9,424,990 |
| Capitalization Rate | 8.5% | 7.9% |
| FMV of Partnership Properties | $100,000,000 | $120,000,000 |
| Less Partnership Liabilities | $41,595,787 | $41,595,787 |
| FC Partnership Net Liquidation Value | $58,404,213 | $78,404,213 |
| Per-Unit Liquidation Value | $614,781 | $825,307 |
| Discounts For: | | |
| Minority Interest | -- | 15% |
| Lack of Marketability | -- | 15% |
| Combined Discount | 67.5% | 28% |
| FMV of Decedent's Ownership Unit: | $200,000 | $594,221 |

In estimating gross annual lease income of $15,082,200, petitioner's expert takes into account lease income received from comparable properties in Midtown South and leases executed by the FC Partnership proximate in time to December 31, 1989. In estimating operating expenses of $6,650,193, petitioner's expert considers operating expenses in prior years, operating expenses of comparable buildings, and various market studies. Taking into account a 5-percent contingency loss for vacancies and noncollection of rent and the above-estimated operating expenses, petitioner's expert estimates annual net lease income from the properties of $8,432,007.

Petitioner's expert then capitalizes estimated annual net lease income by an 8.5-percent capitalization rate, which provides a fair market value for the Partnership Properties of

$100 million ($8,432,007 divided by 8.5 percent equals $99,200,082, rounded to $100 million). Petitioner's expert chooses the 8.5-percent capitalization rate from the 5.9- to 9.2-percent capitalization range reflected in the 1988 C&W report. In his opinion, use of a high capitalization rate (namely, 8.5 percent) is particularly appropriate because of the economic recession and poor commercial real estate environment that existed in New York City in December of 1989.

From the $100 million estimated fair market value of the Partnership Properties, petitioner's expert then subtracts FC Partnership liabilities of $41,595,787 and calculates a net liquidation value for the FC Partnership of $58,404,213 and a pre-discount net liquidation value for each ownership unit in the FC Partnership of $614,781 (1/95 of $58,404,213 equals $614,781).

In determining his combined minority and lack-of-marketability discounts of 67.5 percent, petitioner's expert relies primarily on a July 1989 sale to Mr. Silver for $125,000 of a fractional 62.5-percent interest in a single ownership unit in the FC Partnership. Petitioner's expert calculates that the $125,000 sale price for a 62.5-percent interest in a single ownership unit reflected a 67.5-percent discount from the $614,781 liquidation value of a single ownership unit.[1]

---

[1]    In December of 1985, two individuals inherited ownership of fractional interests in a single ownership unit in the FC
(continued...)

Petitioner's expert also relies on certain market studies that would indicate combined discounts for minority interests and lack of marketability of between 30 and 60 percent.

Respondent's expert concludes that looking ahead from the December 31, 1989, date-of-death valuation date to the years following 1989, lease income from the Partnership Properties would likely increase and the Partnership Properties would likely increase in value. Respondent's expert estimates gross lease income for the first year of $16,345,491 and increases this figure by 5 percent per year over a projected 12-year period, with a 1-percent contingency loss reserve to reflect vacancies and collection losses. Respondent's expert also estimates that operating expenses in the first year of his analysis would equal $6,920,501, and respondent's expert increases estimated operating expenses by 5 percent per year in his cash-flow analysis.

Respondent's expert then capitalizes his 12-year cash-flow projection using a capitalization rate of approximately 7.9

---

[1](...continued)
Partnership -- one individual inherited 62.5 percent of the unit and the other inherited 37.5 percent. In July of 1989, for reasons not made clear in the record, the first individual sold to Mr. Silver his 62.5-percent interest in the ownership unit for $125,000. The record is incomplete with regard to significant aspects of this transaction.

percent reflecting his assumption that leasing activity and market rental rates would increase, and respondent's expert concludes that the December 31, 1989, fair market value of the Partnership Properties equals $120 million (respondent's expert's estimated annual lease income of $9,424,990 divided by 7.9 percent equals $119,303,671, rounded to $120 million).

Using $120 million as the December 31, 1989, value of the underlying Partnership Properties, respondent's expert subtracts FC Partnership liabilities of $41,595,787 and calculates that the 1989 liquidation value of the FC Partnership was $78,404,213 and that the pre-discount liquidation value of each ownership unit in the FC Partnership equals $825,307 (1/95 of $78,404,213 equals $825,307).

Respondent's expert acknowledges that, as of the end of 1989, New York City was in the midst of a recession and banks had become considerably more conservative in their real estate lending practices, and it was anticipated that the New York City commercial real estate market would have difficulty recovering from the economic recession. Respondent's expert, however, fails to adequately take these factors into account in his computations.

In our opinion, petitioner's expert more accurately takes into account the above factors, and petitioner's expert properly concludes that the value of the Partnership Properties declined

from their May 1988 value of $110 million as set forth in the 1988 C&W report. The $110 million valuation reflected in the 1988 C&W report was based on rapid economic growth experienced in prior years, the assumption that such rapid economic growth would continue, and an anticipated steady improvement in the market for leased office space. Those assumptions were no longer accurate as of December 31, 1989.

In light of the recession in New York City's economy and the poor condition of the New York City commercial real estate market at the end of 1989, we believe respondent's expert errs in using estimates for lease income from the Partnership Properties that reflect increases of 5 percent per year.

With respect to the vacancy and noncollection of rent, by the end of 1989, CUNY, which leased 40 percent of the office space in the Partnership Properties, had notified the partnership that it would not likely renew any significant portion of its leases of office space in the Partnership Properties upon the scheduled expiration of its leases in 1992, 1993, and 1994. In light of the decline in economic conditions that was apparent at the end of 1989, and in light of CUNY's likely nonrenewal of its leases, we conclude that a 5-percent contingency loss for vacancy and noncollection of rent is appropriate.

With regard to the estimate of operating expenses, because petitioner's expert used the lower figure of $6,650,193 to

estimate operating expenses, as opposed to the $6,920,501 estimate respondent's expert used, we use petitioner's expert's figure.

With respect to the appropriate capitalization rate to be used in determining the 1989 value of the Partnership Properties, based on New York City's economic condition as of December 31, 1989, and the evidence indicating that lease rates for commercial office space would not likely increase for a number of years, we believe that application of an 8.5-percent capitalization rate more accurately reflects the December 31, 1989, New York City real estate investment environment.

At trial, respondent's expert acknowledged that with regard to comparable sales (used in his report for corroboration of his calculation of fair market value), adjustments for date of sale, size, condition, and use of the buildings would be appropriate. Respondent's expert, however, does not make any such adjustments in his calculations.

Respondent's expert considers three properties sold approximately 3 years prior to December of 1989, two properties sold approximately 1 year prior to December of 1989, and one property sold 5 months after December 1989. These properties were located in different neighborhoods throughout New York City. Each was substantially smaller than the Partnership Properties and sold for significantly less than respondent's expert's

estimated $120 million valuation of the Partnership Properties. Because respondent's expert does not make any adjustments for date of sale, location, condition, or size of the property, we do not find his comparable sales analysis persuasive.

After considering all relevant facts and circumstances and taking into account the expert opinions submitted to us, we conclude that the date-of-death value of the underlying Partnership Properties equaled $100 million, as reflected in petitioner's expert witness report. This value, as of December 31, 1989, is particularly supported by the economic recession that New York City was experiencing, by the weak commercial real estate market, and by CUNY's notification of the likely termination in the early 1990's of a major portion of its lease of office space in the Partnership Properties.

As indicated above, with respect to discounts for minority interest and lack of marketability, petitioner's expert applies a combined discount rate of 67.5 percent to his $614,781 per-unit liquidation value for each ownership unit in the FC Partnership, relying primarily on the July 1989 sale to Mr. Silver of a fractional 62.5-percent interest in a single ownership unit in the FC Partnership.

Respondent's expert relies on various market studies that indicate a discount of approximately 19 percent for minority interests. Respondent's expert believes that an owner of a unit in the FC Partnership could effectively participate in management

of the FC Partnership, and respondent's expert concludes that the appropriate minority interest discount of only 15 percent applies.

With respect to the discount for lack of marketability, respondent's expert also relies on various market studies which indicate appropriate discounts of between 25.8 and 45 percent for lack of marketability. Because the FC Partnership appeared to have been well managed, made regular cash distributions, and had quality tenants, respondent's expert concludes that a 15-percent discount for lack of marketability is appropriate. Combining the two discounts, respondent's expert uses a 28-percent discount to calculate the December 31, 1989, fair market value of decedent's ownership unit. Applying this 28-percent discount to the $825,307 per-unit liquidation value that respondent's expert calculates for each ownership unit, respondent's expert concludes that the date-of-death value of decedent's ownership unit equals $594,221.

In our opinion, with regard to the appropriate minority interest discount to apply, respondent's expert erroneously assumes that an owner of each general partnership unit could participate meaningfully in management of the FC Partnership. Since Mr. Silver controlled a majority of the FC Partnership units, he had practical control over management and operation of the FC Partnership, and holders of minority interests in the FC Partnership would have only limited veto power over the few

partnership matters for which a two-thirds vote was required and then only if the minority partners voted as a block against Mr. Silver.

Although, under New York State law, any general partner of the FC Partnership arguably had the legal authority to dissolve the partnership, see N.Y. Partnership Law sec. 62(1)(b) (McKinney 1988); see also Estate of Bischoff v. Commissioner, 69 T.C. 32, 49 (1977), we believe that such authority would have little impact on Mr. Silver's effective control of the FC Partnership. We note that neither expert considered this arguable authority in determining a minority interest discount.

The various market studies presented in the experts' reports indicate that purchasers of business interests whose principal assets consist of real property typically apply a discount of approximately 19 percent where they are purchasing minority interests in the businesses and would have little voice in management of the businesses. As indicated above, an owner of a single unit in the FC Partnership effectively would have no voice in management of the FC Partnership.

We conclude that in this case it is appropriate to apply a minority interest discount of 19 percent to decedent's ownership unit in the FC Partnership.

With regard to the discount for lack of marketability, it is clear that a single ownership unit in the FC Partnership was not readily marketable and that any hypothetical purchaser would

demand a significant discount to account for that fact. Market studies admitted into evidence indicate that appropriate lack-of-marketability discounts often fall in a range of 25.8 to 45 percent. Certainly, the consistent history of significant cash distributions and the history of quality management of the FC Partnership would make the partnership an attractive investment. There still existed, however, no public market in which to sell ownership units in the FC Partnership, and transfer of a unit would be subject to the approval of Mr. Silver, as owner of the controlling units of the FC Partnership.

Because the FC Partnership was well managed and made consistent and significant annual cash distributions, we conclude that the appropriate discount to use in this case to reflect lack of marketability of decedent's ownership unit in the FC Partnership equals 26 percent.

We disagree with petitioner's expert's conclusion that a 67.5-percent combined discount rate should apply. The record does not contain sufficient facts with regard to the July 1989 sale to Mr. Silver of a fractional interest in one ownership unit in the FC Partnership to justify petitioner's expert's reliance thereon.

After considering all of the facts and circumstances and the evidence presented at trial, we conclude that the appropriate combined discount rate to use in this case for minority interest and lack of marketability equals 45 percent (19-percent discount

for minority interest and 26-percent discount for lack of marketability).

Applying this 45-percent combined discount to the per-unit partnership liquidation value that we have found provides a date-of-death fair market value of $338,130 for decedent's ownership unit in the FC Partnership.

The schedule below reflects our conclusions with regard to each element of the relevant computation of fair market value:

Valuation of Partnership
  Properties Before Discounts:

| | |
|---|---:|
| Estimated Gross Annual Lease Income | $15,082,200 |
| Contingency Loss Reserve | 5% |
| Operating Expenses | $6,650,193 |
| Estimated Annual Lease Income | $8,432,007 |
| Capitalization Rate | 8.5% |
| FMV of Partnership Properties | $100,000,000 |
| Less Partnership Liabilities | $41,595,787 |
| FC Partnership Net Liquidation Value | $58,404,213 |
| Per-Unit Liquidation Value | $614,781 |

Discounts For:

| | |
|---|---:|
| Minority Interest | 19% |
| Lack of Marketability | 26% |
| Combined Discount | 45% |

FMV of Decedent's Ownership Unit:                    $338,130

To reflect the foregoing,

Decision will be entered

under Rule 155.
